115 N.J. Super. 237 (1971)
279 A.2d 116
MARIA LOPEZ, ALSO KNOWN AS MARY AND MARIANTONIA LOPEZ, AND FRANK LOPEZ, HER HUSBAND, PLAINTIFFS-APPELLANTS,
v.
ALFRED J. SWYER, M.D.; MILTON DANON, D.O.; ROBERT OSDER, D.O., AND HAROLD STRICKER, D.O., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1971.
Decided June 22, 1971.
*240 Before Judges GOLDMANN, HALPERN and FRITZ.
Mr. David A. Pressler argued the cause for appellants (Mrs. Sylvia B. Pressler on the brief; Messrs. Okin, Pressler & Scherby, attorneys).
Mr. John J. Francis, Jr. argued the cause for respondent Alfred J. Swyer, M.D. (Messrs. Shanley & Fisher, attorneys).
Mr. Francis P. Witham argued the cause for respondents Milton Danon, D.O., Robert Osder, D.O., and Harold Stricker, D.O. (Mr. John P. Markey, of counsel; Messrs. Markey and Witham, attorneys).
The opinion of the court was delivered by FRITZ, J.A.D.
In this action charging medical malpractice, fraud, and conspiracy, plaintiffs appeal from summary judgment in favor of defendants.
The matter has been here before. Following earlier motions for summary judgment, granted as to defendant Swyer but denied as to the other defendants, plaintiffs and unsuccessful defendants sought leave to appeal. We reserved decision on these motions, and remanded for the taking of depositions of defendants  plaintiffs had been deposed prior *241 to the motions  and for reargument before the trial court. Extensive depositions were taken of the four defendant doctors. The trial court again heard argument, and this time entered summary judgment in favor of all defendants (although all that was before the court in addition to that proffered on the earlier motions were defendants' depositions). It is from this determination plaintiffs appeal.
We have had the benefit of all the depositions. Since Judson v. Peoples Bank & Trust Co., 17 N.J. 67 (1954), it is axiomatic that on a motion for summary judgment,
* * * it is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact, 6 Moore's Federal Practice, par. 56.15(3). The phrasing of our rule, R.R. 4:58-3, slightly different from Federal Rule 56(c), underscores this in the requirement that the absence of undisputed material facts must appear "palpably." All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated, Templeton v. Borough of Glen Rock, 11 N.J. Super. 1, 4 (App. Div. 1950). And it is not to be concluded that palpably no genuine issue as to any material fact exists solely because the evidence opposing the claimed fact strikes the judge as being incredible. Arnstein v. Porter, 154 F.2d 464, 469 (C.C.A. 2 1946). Issues of credibility are ordinarily for the trier of fact, and the judge does not function as a trier of fact in determining a motion for summary judgment. * * *. (At page 74-75.)
With this mandate in mind, we observe that the evidence offered and reasonable inferences therefrom can be said to support the following facts for the purpose of these motions.
In December 1961 plaintiff[*] Maria Lopez, then 32 years old and a housewife and mother, noticed a lump in her right breast. She consulted defendant Milton Danon, a doctor of osteopathy, who had been her personal physician for about eight years and was in addition a close personal friend. He immediately arranged for surgery by one Dr. Laidman who is not here involved. When malignancy was discovered, *242 a radical mastectomy was performed. Metastasis was suspected during surgery, as a a result of which "all lymph glands that they could find in the axilla * * * everyone in sight" were also removed. Metastasis was confirmed on pathologic report the following day. As a matter of caution, in that which is apparently a common practice and is not here challenged, radiation therapy was recommended by the surgeon. Danon referred plaintiff to defendant Alfred J. Swyer, a radiologist. He administered X-ray treatments daily except Sundays from January 8, 1962 to February 13, 1962. For this referral Danon received one-third of Swyer's fee.
Commencing during the period of treatment by Swyer and continuing until the present, plaintiff's reaction to the radiation therapy has been dramatically calamitous. From pain, nausea, and burning, including a burning of the axillary hair during treatment, plaintiff's condition deteriorated to such an extent, for instance, that her skin burned "so severely that I bandaged myself so that nobody would see the smoke come out of me." She developed necrotic ulcers requiring surgical repair. The X-ray burn produced suppuration from the surgical incision. The pain was intense and constant. Not the least of the resultant injuries was that of radiation fibrosis of the lung. Spontaneous rib fractures occurred. A phrenic nerve block was employed as a palliative for the intense pain. She was hospitalized 15 times while under the care of Danon, Osder, and Stricker. In March 1967 Mrs. Lopez entered New York University Hospital for reconstructive surgery. She is still under medical supervision.
As noted above, Dr. Dwyer's treatment was concluded on February 13, 1962. Except for an X-ray taken on April 10, 1962, and one house visit when Dr. Swyer was called in the absence of Dr. Danon, Swyer did not again see plaintiff. However, the severity of plaintiff's ensuing disability caused her to seek medical advice from Dr. Danon and those associated with him in office practice frequently and regularly *243 until about January 1966 or shortly thereafter, when she was advised by Dr. Stricker that he would not treat her any more. She has had substantial medical treatment since, including the reconstructive surgery and continuing until the present. The treatment after early 1966 was by other doctors not here involved.
It is appropriate to note the relationship between defendant doctors during the period from December 1961 to January or February 1966. All except Dr. Swyer are doctors of osteopathy. Dr. Swyer is a radiologist. In June or July 1961 Danon engaged Osder in the office which Danon maintained, and Osder became a partner of Danon about a year later. Dr. Stricker joined the two of them as an employee shortly after he became licensed in August 1965. Dr. Danon left the practice of medicine on December 31, 1965 and spent about six months as a junior partner in a brokerage firm. When he resumed the practice of medicine in June 1966 it was in the field of anesthesiology.
The Danon office referred patients requiring services in Dr. Swyer's field to Dr. Swyer, at least until sometime in 1962. For this the referring doctor received a third of Swyer's fee. Sometime in the middle of 1962, at the time of or just before plaintiff's first hospitalization, but not later then September 1962, Danon and Osder, then partners, stopped referring patients to Swyer. Ostensibly a strained relationship was produced by impatience on the part of Swyer when Danon asked to him to locate an X-ray film of a mutual patient, not the plaintiff. (In October 1962 Dr. Swyer advised his malpractice insurance carrier of the fact that he "might have difficulty" with Mrs. Lopez.) The referral relationship between Drs. Osder and Stricker was not resumed with Swyer until 1966, after Dr. Danon had terminated his association with them.
On September 18, 1967 plaintiffs commenced this action against defendants. They charge Swyer with negligence in the radiation treatments, and Danon, Osder, and Stricker with intentionally false reassurances and willfully keeping *244 from them proper medical advice relating to the treatment and its effects. They allege a conspiracy among Danon, Osder, and Stricker and with Swyer in connection with the improper medical advice. They assert additionally that Danon, Osder, and Stricker fell below the standard required of the reasonable physician with respect to the reassurances and advice and were thus negligent.
Beyond denying negligence, defendants deny having misinformed plaintiffs intentionally or otherwise and disavow the existence of a conspiracy. They concede the early existence of substantial physical difficulties, set forth their advice to plaintiff with respect to the relationship of these difficulties to the Swyer treatment and as residuals thereof, and argue therefrom that plaintiff either knew or must have known of her difficulties and relationship to the Swyer treatment in 1962. It is upon this predicate that the statute of limitations is urged.
Plaintiffs' response to the statute of limitations defense is that, while Maria Lopez was gravely ill, they did not understand that this illness was produced by the negligence of Dr. Swyer, and this because of the reassurances given her over the years by Danon, Osder and Stricker. In this regard, plaintiff admits that inquiry was made of Dr. Danon early in 1962, during treatment, about whether "malpractice" was occurring. Her husband's deposition quotes Dr. Danon as having said, "This was not malpractice. This sometimes happens." Dr. Danon also testified in deposition with respect to his recollection about discussion of a malpractice suit. He had such a recollection, but did not recall specifically what was said since he was "mainly a listener."
In March 1967 Mrs. Lopez, while in a hospital for one of the stages of the reconstructive surgery, was displayed to "forty, fifty doctors" by the doctor who had charted the surgical procedure. These doctors retired to an adjacent room, evidently for the purpose of discussing the case. Mrs. Lopez heard their conversation through an open door. Her testimony in this respect was as follows:
*245 * * * So I heard this doctor mention my name, and I began to listen very intently. And this conversation did state that here was a woman who was on 300 milligrams of demerol a day, couldn't stand the pain, when she came. And then he made a statement that I remember verbatim, every word: "And there you see, gentlemen, what happens when the radiologist puts a patient on the table and goes out and has a cup of coffee."
This, she says, is the first she knew of the relationship between her difficulties and the negligent treatment of Swyer.
We are of the opinion that the trial judge erred in entering judgment for defendants on a summary judgment motion. We believe plaintiffs should have the opportunity for a jury determination with respect to the factual questions of the alleged negligence of the respective doctors, the fraud and conspiracy issues, and the date or approximate date on which plaintiffs knew or might reasonably have been expected to know the nature of the injuries complained of and their relation to the alleged negligence of Dr. Swyer.
The most difficult of the questions presented has to do with the application to this case of the law relating to the statute of limitations. The problem is compounded by the variety of plaintiffs' claims and some disparity among the considerations to be applied in arriving at a conclusion of law pertaining to each. For instance, other than the conspiracy allegation, the claim against Swyer is simply for negligent treatment. On the other hand, while the claims against Danon, Osder, and Stricker also assert, simply enough, negligent treatment by way of bad advice, in addition they allege fraud and seek, beyond this, to impose upon the physician an affirmative duty of disclosure.
A general observation should be made at the outset. Under the so-called "discovery rule" of Fernandi v. Strully, 35 N.J. 434 (1961), for defendant to prevail on a statute of limitations defense it is not enough that a plaintiff knows of the injury for which claim is made as a residual of the purported offensive treatment, but he must know or have reason to know that such treatment was negligently administered. This comment is appropriate here because defendants *246 urge, correctly enough, that the physical injury immediately consequent to the treatment was so manifest that plaintiff must have known she had been harmed. While the severity of the injuries is beyond question under the facts of this case, and is in fact borne out by plaintiffs' testimony, we believe that plaintiffs' knowledge of the causal relationship of these physical injuries to negligent treatment by Swyer remains a fact question concerning which, under the circumstances of this case, the minds of reasonable men could differ. Indeed, if the testimony of Mrs. Lopez is believed, she had no reason to suspect that what was happening to her, as bad as it was, was anything other than a normal reaction to this radical treatment. Cf. Toal v. United States, 438 F.2d 222 (2 Cir.1971).
Contemporary consideration of statute of limitations questions in medical malpractice cases commences with Fernandi v. Strully, 35 N.J. 434 (1961). There the court construed the two-year statutory limitation relating to personal injuries (N.J.S.A. 2A:14-2). It held that the accrual of a cause of action in a medical malpractice case does not occur  at least where a physician leaves a foreign object concealed in a patient's body during an operation  until the patient "knows or has any reason to know about the foreign object and the existence of the cause of action based upon its presence." The holding was obviously guarded. Policy considerations relating to such things as the statutory purpose of repose contrasted with individual injustices, and the danger of false, frivolous, speculative or uncertain claims were discussed.
Next appeared Rothman v. Silber, 90 N.J. Super. 22 (App. Div. 1966), certif. den. 46 N.J. 538 (1966). Here the alleged malpractice had to do with the administration of anesthesia, i.e., "the introduction of a foreign substance into her body." The court recognized the guarded language of Fernandi and limited the exception to the general rule (since commonly called the "discovery rule") to foreign substances unintentionally incorporated into the patient's body by inadvertence. Summary judgment for defendants was entered.
*247 In 1968 the Supreme Court had occasion to consider the "discovery rule" in three nonmedical cases. Rosenau v. New Brunswick, 51 N.J. 130 (1968) (a defective water meter); New Market Poultry Farms, Inc. v. Fellows, 51 N.J. 419 (1968) (a negligent land survey); and Diamond v. New Jersey Bell Telephone Co., 51 N.J. 594 (1968) (an improperly installed telephone conduit). While each of these cases was decided within the framework of the facts appearing in the case, each considered the potentiality for injustice in further refining the rule, and each applied the discovery rule in determining the time when the cause of action accrued.
This effort to insure a trial on the merits rather than summary disposition on a statutory defense, at least in situations where plaintiff acted promptly upon discovery of the cause of action and where harm to defendant did not appear or was nominal (or, as in Diamond, supra, at 51 N.J. 601, the disadvantage by virtue of passage of time was as great to plaintiff as to defendant), produced a reappraisal of the Rothman case in the next and most recent medical statute of limitations case. In Yerzy v. Levine, 108 N.J. Super. 222 (App. Div. 1970), Judge Labrecque, who had written the opinion in Rothman, recognized the policy established by Rosenau, New Market, and Diamond, correctly we believe, and extended the discovery rule to a situation in which a surgeon had severed the common bile duct. It is to be noted that this extension of the rule removed the requirement of Rothman stated in terms of a "foreign substance" and made the rule applicable to anatomical injury. It is to be observed at the same time that both Rothman and Yerzy were concerned with internal, hidden mistakes.
Yerzy was certified and the Supreme Court, in a brief per curiam opinion, affirmed the Appellate Division "for the reasons given by it," but "with the modification that under the facts of this case (1) the question with respect to the statute of limitations is whether plaintiff brought this action within two years after plaintiff knew or had *248 reason to know that plaintiff might have a basis for a claim against the defendant." 57 N.J. 234, 235 (1970). The inclusion of the phrase "under the facts of this case" in the Yerzy affirmance suggests a more explicit definition of the rule here.
Defendants endeavor to distinguish the rule of Fernandi, as implemented by Rothman and Yerzy, from the present situation by pointing out that the reported cases have dealt only with internal injuries and that the severe external injuries in the present case negate "the possibility of the application of the exceptional `discovery' rule." We think such a limited view overlooks the reason for the rule. Where plaintiff has acted promptly after gaining knowledge of his injuries and their causal connection with negligent medical treatment, and the passage of time neither lends inspiration to fraudulent claims nor puts defendant at a disadvantage from a standpoint of proofs, we do not believe that the policy considerations concerning repose are paramount to those suggesting justice by a trial on the merits. In other words, we believe the true rule in any medical malpractice case to be that a cause of action does not accrue until plaintiff is or should be aware of his injury and its causal relationship to the negligent treatment unless  as mandated by the inclusion of reference in the Yerzy affirmance to the "facts of this case"  the circumstance of delay suggests injustice will thereby be done. Examination of the potential for injustice requires that the situation be measured by the criteria laid down in the cases cited above, i.e., the danger of a fraudulent, false, frivolous, speculative or uncertain claim, or substantial difficulty in defendant's testimonial proof of a defense by virtue of the passage of time.
With reference to the instant matter, the delay suggests no such injustice. Defendants have been aware from the time of Swyer's treatment of the extraordinary seriousness of plaintiff's injuries. In fact, they charge her with at least constructive knowledge by virtue of the seriousness of the *249 injuries. Most significantly, Dr. Swyer advised his malpractice carrier of the potential for difficulty. Without respect to the matter of proofs, it is inconceivable that the facts of this case lend themselves to fraudulent, false, frivolous, speculative or uncertain claims. With regard to proofs, if there is a difficulty for the defendant doctors, it is one of their own making. By their own testimony they acknowledge the mention of malpractice early in 1962. Their records are as complete as they ever were. All defendants are available for trial. The relative sharpness of their recollection, somewhat diminished by time, of course, but supported by voluminous medical records, is attested to in their depositions. In this respect, defendants certainly are at the very least no worse off than are plaintiffs. See Diamond, 51 N.J. at 601.
The statement of the late Justice Oliphant, then sitting as a Circuit Court Judge, quoted in Rosenau, from Hughes v. Eureka Flint, etc., Co., Inc., 20 N.J. Misc. 314 (Cir. Ct. 1939), is appropriate:
It imposes hardships upon a defendant by compelling him to meet a claim involving his actions of many years before, but it would be even more undesirable and unjust to bar a plaintiff's remedy before his cause of action existed, which is certainly equally violative of the intent of the statute, definitely not violative of its language and infinitely more abhorrent to logic and justice * * *. [At 316]
Plaintiffs urge a general extension of the statute of limitations under the so-called "continuing treatment doctrine" claiming that the "modern view" does not permit the statute of limitations to commence running in any event until the conclusion of the entire course of treatment. De Haan v. Winter, 258 Mich. 293, 241 N.W. 923 (Sup. Ct. 1932); Williams v. Elias, 140 Neb. 656, 1 N.W.2d 121 (Sup. Ct. 1941); Frazor v. Osborne, 57 Tenn. App. 10, 414 S.W.2d 118 (Ct. App. 1966, cert. den. 1966); Annotation, 80 A.L.R.2d 368, esp. § 6 at 379. The proposition, as a general one, is offensive to the decisional law of our court of last resort. Tortorello v. Reinfeld, 6 N.J. 58 (1950). *250 Under such circumstances, it is not the function of the Appellate Division to alter the rule. Orlik v. De Almeida, 45 N.J. Super. 403, 409 (App. Div. 1957).
On the other hand, Tortorello suggests that a course of negligent treatment is a continuing tort whereby (6 N.J. at 66) "* * * the statute does not ordinarily begin to run until the injurious treatment is terminated unless the patient discovered or should have discovered the injury before that time," thus bringing us squarely upon plaintiffs' claims here of the negligence of Danon, Osder and Stricker and their additional claims of equitable fraud.
Tortorello states that if a defendant doctor is guilty of negligent conduct, whether of commission or omission, in a continuing course of treatment, the statute does not ordinarily begin to run until the injurious treatment is terminated unless the patient discovered or should have discovered the injury and its causal connection with the negligent treatment before that time. While this is apparently dictum in the Tortorello case, the Supreme Court there announced its complete accord with the rule, and we adopt it here. Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825 (Ct. App. 1966); Garlock v. Cole, 199 Cal. App.2d 11, 18 Cal. Rptr. 393 (D. Ct. App. 1962).
In addition to the claims of negligence, plaintiffs contend that they were intentionally misled by defendant doctors. They thus assert fraud. The general limits of such fraud, which may be made the basis of a claim for relief, are (1) a representation by defendant to plaintiff with intent that the latter rely upon it; (2) knowledge on the part of defendant that the representation is in fact false; (3) belief by plaintiff that the representation is true; (4) reliance on such representation, and (5) injury. Mazza v. Winters, 95 N.J. Super. 71, 76 (App. Div. 1967). In this respect we find sufficient evidence of proof in the depositions to raise a factual question.
Plaintiffs also argue that even if they were not intentionally misled, the failure of Danon, Osder and Stricker *251 affirmatively to come forth with proper advice constituted a wrong. The duty of a doctor affirmatively to disclose to his patient the nature of his illness and, in appropriate circumstances, its cause, has been considered in New Jersey principally in cases relating to so-called "informed consent" with respect to operative procedures. See Kaplan v. Haines, 96 N.J. Super. 242 (App. Div. 1967), aff'd o.b. 51 N.J. 404 (1968). We hold that the relationship between a doctor and his patient is of such a confidential and vital nature that an affirmative duty requiring the doctor to disclose to his patient fully the facts of the medical case does exist and that silence in this regard may be sufficient to infer a constructive misrepresentation. Guy v. Schuldt, 236 Ind. 101, 138 N.E. 2d 891 (Sup. Ct. 1956); Stafford v. Shultz, 42 Cal.2d 767, 270 P.2d 1 (Sup. Ct. 1954); Garlock v. Cole, supra. We observe that Tortorello, in the dictum referred to above, speaks of "the continuing neglect to advise a proper course of treatment" as a "continuing tort." 6 N.J. at 66. See also Pashley v. Pacific Electric R. Co., 25 Cal.2d 226, 153 P. 2d 325, 329-330 (Sup. Ct. 1944); 41 Am. Jur., Physicians and Surgeons, § 73, 195; Estep & Van Dyke, "Radiation Injuries: Statute of Limitations Inadequacies in Tort Cases," 62 Mich. L. Rev. 753, 773-774 (1964).
By reason of medical considerations related to the welfare of the patient (for instance, the recurrent problem of whether cancer patients should be "told"), caution should be exercised in the application of such a rule consistent with fairness to the physician in the exercise of his best judgment. This balancing of delicate policy considerations and equitable principles can be best achieved by application of the yardstick set down in Kaplan:
* * * Plaintiff has the burden to prove what a reasonable medical practitioner of the same school and same or similar community, under the same or similar circumstances, would have disclosed to his patient and the issue is one for the jury where * * * a fact issue is raised upon conflicting testimony as to whether the physician made an adequate disclosure. * * *. [96 N.J. Super. at 257]
*252 We turn to the conspiracy charge. No reason occurs to us in this respect for the application of any statute of limitations considerations other than those set forth above. With regard to the substantive claim, a dearth of direct proof is apparent. This is not surprising. Conspiracy is seldom written elsewhere than upon the wind. The relationship between defendants Danon, Osder and Stricker, including their questionable fee-splitting relationship with Swyer and its termination in 1962, as well as Swyer's advice to his malpractice carrier, suggest in their totality an inference sufficient to resist a motion for summary judgment. Language from Judson is particularly apposite:
Where, as here, the opposing party charges the moving party with willful fraud and must probe the conscience of the moving party (or its officers, when, as here, a corporation) to prove his case, or in any case where the subjective elements of willfulness, intent or good faith of the moving party are material to the claim or defense of the opposing party, a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain. The telltale factor of demeanor in the presence of the trier of fact often assumes such vital importance in such cases that the opposing party should generally not be denied the opportunity to have the moving party, or its officers, appear on the witness stand before the trier of fact. * * *. [17 N.J. at 76]
With consideration for all the foregoing, a careful review of the factual presentation before the court in this matter convinces us that sufficient factual questions relating to the alleged negligence of all the physicians, the alleged fraud of Danon, Osder, and Stricker, and the alleged conspiracy remain to warrant the submission of these issues to a jury, together with the question as to when plaintiffs knew or should reasonably have known the nature of Maria's illness and its causal relationship with the alleged negligence. Our conclusion in this regard is prompted by our duty, at this stage of the proceedings, "to assume the truth of the allegations of the complaint except insofar as they are contradicted by concessions of the plaintiff" (New Market, 51 N.J. at 420), "notwithstanding that the plaintiffs may have difficulty *253 at trial in establishing them" (Rosenau, 51 N.J. at 135). As directed by Judson, we give plaintiffs the benefit of all reasonable doubts in arriving at this conclusion. Although probably unnecessary, we note that defendants may, of course, contest at trial any factual conclusion which on this motion we were obliged to assume to be true. Under such circumstances, the entry of summary judgment in favor of defendants was in error.
Reversed and remanded for trial in conformity with this opinion.
NOTES
[*] Frank Lopez, husband of Maria, sues per quod. References hereafter to plaintiff are to Maria.