ISABEL LYNCH, PLAINTIFF-APPELLANT, v. GERALD E. RUBACKY, M.D., DEFENDANT-RESPONDENT.

Argued September 8, 1980—Decided January 27, 1981.

66

Anthony M. Mahoney argued the cause for appellant (*Bernstein and Mahoney*, attorneys; *Dennis M. Mahoney* and *Marc M. Gaelen*, on the briefs).

*Raymond M. Tierney, Jr.* argued the cause for respondent (*Shanley & Fisher*, attorneys; *John D. Clemen*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is a medical malpractice case involving the "discovery rule" doctrine as set forth in *Lopez v. Swyer,* 62 *N.J.* 267 (1973). The appeal presents again the perplexing issue of when, under *N.J.S.A.* 2A:14–2, a cause of action accrues for purposes of measuring the statutory period of limitations within which a personal injury suit must be filed. In this case, the trial court ruled that the plaintiff, who claims that she suffered injury as a result of the defendant physician's malpractice, failed to file her suit within two years of the time she should have "discovered" that she had an actionable claim for these injuries. Accordingly, the trial court dismissed the action. We are called upon to review the correctness of this decision.

I

The facts were developed at a hearing conducted by the trial court pursuant to *Lopez v. Swyer, supra,* to determine when plaintiff's cause of action accrued under the "discovery rule." Plaintiff, Isabel Lynch, fractured her ankle on December 30, 1972, when she slipped and fell down the front steps of her house. She immediately came under the care of defendant, Dr. Gerald E. Rubacky, at Mountainside Hospital in Montclair. He diagnosed plaintiff's injury as a compounded fracture of the right ankle (trimalleoler fracture) and proceeded initially to set the fracture through a closed reduction. An open reduction proved necessary, however, and a few days later, on January 4, 1973, Dr. Rubacky performed an operation to close the fracture; he inserted three pins in the ankle which was then placed in a cast.

Dr. Rubacky removed the cast from plaintiff's ankle in early March 1973, at which time she complained of "severe pain and

quite a bit of swelling." In April and May 1973, she continued to experience, in her words, "severe pain, indescribable pain that was keeping [her] awake at night and almost to the point of tears at times." Plaintiff had to use crutches, a cane or a walker to assist in walking. Nevertheless, defendant assured her that her condition was a natural part of the healing process, and during her May visit he instructed to her to "get rid of everything," advising her that she did not need anything to assist her walking because the ankle was healing.

At that time defendant also told plaintiff not to come back to see him until October. But, she returned in July because she "couldn't stand the pain any longer." Upon reviewing x-rays on this occasion, defendant informed plaintiff that one of the pins was out of place. As a result, at the end of July, plaintiff again underwent surgery for the removal of the pin. Plaintiff thereafter continued under defendant's care.

During the next several months, despite persistent pain and swelling and inability to place full weight on the injured ankle, plaintiff was told by Dr. Rubacky that she should return to her regular work as a hairdresser and that her condition was "part of the healing process and eventually it will go away." In January 1974, although Mrs. Lynch's complaints and symptoms had not abated, Dr. Rubacky told her that her ankle was completely healed and that there was absolutely nothing wrong with her; he said her problems were "all in [her] head and that [she] should . . . seek the attention of a psychiatrist." Still, he did not discharge her but stated that she should return in six months.

Plaintiff then made an appointment with another orthopedic surgeon, Dr. Peter Argiroff, who did not see her until February 1974. Dr. Argiroff took x-rays of her ankle and told her that, in his opinion, she would have to have another operation or "[her] ankle would never be any better." That operation was performed on February 21, 1974, and plaintiff's ankle was placed in a cast. She went for monthly checkups until the cast was

removed in May 1974. During this entire period of time Dr. Argiroff did not advise or otherwise intimate to plaintiff that Dr. Rubacky's medical treatment itself had actually caused or contributed to her condition. During the May visit, however, Dr. Argiroff informed her for the first time that in the operation performed by him in February, he had "removed a pin . . . in the joint and [that] it should not have been there." He also told plaintiff that "the first two operations were not done properly . . . ." He added that "he didn't want to get involved in any malpractice situation. He couldn't—he didn't feel he wanted to point a finger at anyone."

Upon this record the trial judge concluded that plaintiff "by the exercise of reasonable diligence and intelligence should have known or discovered a basis for an actionable claim against the defendant no later than February of 1974." Because the complaint was filed more than two years beyond that date, in May 1976, the judge found the action to be time barred under *N.J.S.A.* 2A:14–2 and granted defendant's motion to dismiss. An appeal was taken by plaintiff and the Appellate Division affirmed the dismissal of plaintiff's complaint in an unpublished opinion. We granted certification on plaintiff's petition to determine whether the discovery rule was properly applied in this case. 82 *N.J.* 291 (1980). We conclude that it was not and now reverse.

II

Both parties in this case agree that because plaintiff was unaware of the true nature of her injuries during the course of her medical treatment by defendant, she was entitled to invoke the "discovery rule" to toll, for some length of time, the running of the two-year statute of limitations. The parties disagree, however, as to when under the circumstances of this case the statute of limitations was activated.

The appropriate standard for resolving this kind of dispute was set forth in *Lopez* as follows:

> This doctrine ... provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim ... [or] knows or has reason to know that he has a right of redress. [62 *N.J.* at 272, 274.]

As emphasized in *Lopez*, the discovery rule centers upon an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of another person. Such knowledge involves two key elements, injury and fault. The Court in *Lopez* defined two classes of injured claimants whose ignorance or lack of knowledge concerning the nature and source of injury should not, without more, bar relief. In one, the person may be generally unaware of an injury until after the statutory period has expired. "In other cases," said the Court, "damages may be all too apparent, but the injured party may not know it is attributable to the fault or neglect of another." *Id.* at 274. This principle, with its dual emphasis upon fault as well as injury, was most recently repeated in *Tevis v. Tevis*, 79 *N.J.* 422, 432 (1979) (*dictum*) ("[W]hen a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another, the cause of action does not accrue until the discovery of the injury or facts suggesting the fault of another person").

In this case, the underlying facts are not actually in sharp dispute. The shortcoming of the determination below rests not so much upon the facts as determined by the trial court as upon the legal significance of these facts under the discovery rule, and more specifically their legal significance in terms of knowledge of fault as a constituent element of the discovery rule.

The trial court relied upon *Burd v. New Jersey Telephone Company*, 76 *N.J.* 284 (1978), a products liability case, which dealt with the question of proximate cause and the quality of a claimant's knowledge that will signal "the commencement of accrual of the cause of action." *Id.* at 291. The Court there explained that such knowledge exists when "plaintiff learns, or

reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action," *id.*, (emphasis in original), and that the "basis" of such a cause of action, "is, of course, constituted solely by the material facts of the case." *Id.* at 291–292.

The *Burd* case is not to be viewed as a retreat from *Lopez v. Swyer, supra,* in the sense of either minimizing or rejecting knowledge of fault as a necessary component of a factual basis for a claim against another. The *Burd* decision fully embraces *Lopez,* as well as the medical malpractice decisions cited therein, which have contributed to the evolution of the discovery rule and have consistently considered knowledge of fault as well as injury to be requisite for the accrual of a cause of action.

In many cases, knowledge of fault is acquired simultaneously with knowledge of injury. It was observed in *Diamond v. N.J. Bell Telephone Co.,* 51 *N.J.* 594, 601 (1968): "In the medical malpractice situation, the presence of a foreign object provides a ready basis for inference of proximate causation *and negligence* without further proof." (emphasis added) See also *Fernandi v. Strully,* 35 *N.J.* 434 (1961) (plaintiff's discovery of her injurious condition entailed the simultaneous discovery that her injury was attributable to the fault of another); *Yerzy v. Levine,* 108 *N.J.Super.* 222, 229 (App.Div.1970), modified 57 *N.J.* 234 (1970) (facts therein, as well as in *Fernandi,* disclosed "actions which themselves bespoke negligence.").

On the other hand, there are medical malpractice cases where fault is not implicit in injury. *E. g., Lopez v. Swyer, supra; Alfone v. Sarno,* 139 *N.J.Super.* 518 (1976), certif. den. 71 *N.J.* 498 (1976); *cf. Moran v. Napolitano,* 71 *N.J.* 133, 138 (1976) (application of discovery rule not limited exclusively to the "self-evident negligence situation."). In the *Lopez* case, for example, plaintiff had suffered burns and endured a great deal of pain from radiation therapy administered as partial treatment by defendants. After a considerable period of suffering, she sought assistance from another doctor. She later overheard

a doctor who was examining her in the hospital say to other doctors who were present, "And there you see, gentlemen, what happens when the radiologist puts a patient on the table and goes out and has a cup of coffee." 62 *N.J.* at 271. Plaintiff filed suit within seven months of this specific revelation but well after two years of defendant's last treatment. The Court determined that the suit was timely, concluding that it would be inequitable to deny an injured person the opportunity to press a claim when she was unaware that her injury was occasioned by the fault of another.[1]

Similar emphasis upon the need to show awareness of fault, when that is not self-evident or implicit in the injury itself, can be found in *Alfone v. Sarno, supra,* cited with approval in *Tevis v. Tevis, supra,* 79 *N.J.* at 432. In *Alfone,* the plaintiff became aware that something was seriously wrong immediately after undergoing an operation upon her thyroid gland on March 11, 1965. In actuality, a parathyroid gland had been surgically excised. Her doctor, however, reassured her by saying that the parathyroid gland which was "thinner than hair" was only "asleep" after being "touched" by a surgical instrument during surgery. By June 1966 plaintiff had come to believe that she suffered a permanent injury. The trial court found this information was sufficient for her to have "discovered" she had an actionable claim. Thus, the court dismissed plaintiff's claim since it was not brought until September 1968, more than two years after the trial court determined that the statute had begun to run. The Appellate Division, however, reversed, finding that plaintiff did not have the requisite knowledge until

---

[1]Significantly, the Court in *Lopez* did not disapprove or impugn the Appellate Division's understanding that knowledge of fault is an essential element in the accrual of a cause of action under the discovery rule:

We believe plaintiffs should have the opportunity for a jury determination with respect to ... the date or approximate date on which plaintiffs knew or might reasonably have been expected to know the nature of the injuries complained of *and their relation to the alleged negligence of Dr. Swyer.* [115 *N.J.Super.* 237, 245 (App.Div.1971) (emphasis added)]

August or July of 1967 when she was actually told by a doctor friend who was present at the surgery that the gland had been removed. The court stressed that prior to this material disclosure "[t]he evidence [did] not support a finding that under the circumstances there should have existed in [plaintiff's] mind a disbelief of her physician or *a suspicion that he himself was at fault."* *Alfone v. Sarno, supra,* 139 *N.J.Super.* at 524–525 (emphasis added). Accord, *Duffy v. Ackerhalt,* 138 *N.J.Super.* 119, 122 (App.Div.1975), certif. den. 70 *N.J.* 273 (1976) ("the discovery rule . . . defers accrual of a cause of action for malpractice until the date on which plaintiff knew or should have known that her continued illness was attributable to the fault or neglect of the defendant"); see also *Schum v. Bailey,* 578 *F.*2d 493, 494–495 (3d Cir. 1978).[2]

█ It is thus clear that the discovery rule embraces knowledge of fault. The contribution of *Burd* to this area of the law is its emphasis upon the *factual* nature of an injured party's knowledge of a basis for a cause of action. As there stressed, a plaintiff must have an awareness of "material facts" relating to the existence and origin of his injury rather than comprehension of the legal significance of such facts. 76 *N.J.* at 291–293.

The *Lopez* inquiry, directed to a determination of the operative facts which were or should have been known to a plaintiff, obviously must focus upon fault as well as injury. That inquiry, though basically factual, should be punctilious and probing. The interplay of the conflicting interests of the competing parties must be considered. The decision requires more than a single factual determination; it

---

[2]In the particular factual setting involved in *Silverman v. Lathrop,* 168 *N.J.Super.* 333, 339–340 (App.Div.1979), medical fault was inextricably intertwined with injury and thus the requirement as to knowledge of fault was implicitly satisfied (". . . by December 1972 [plaintiff] was well aware of all the implications of his condition and of *defendant's possible medical dereliction* . . .") (emphasis added). To the extent that any other case, such as *Rankin v. Sowinski,* 119 *N.J.Super.* 393 (App.Div.1972), eliminates knowledge of fault as a requisite of plaintiff's knowledge of an actionable claim, it cannot survive *Lopez* and our decision today.

should be made by a judge and by a judge conscious of the equitable nature of the issue before him.

[*Lopez v. Swyer, supra,* 62 *N.J.* at 275.]

To the extent that fault is not self-evident or obviously revealed by the injury itself, the judicial search into an aggrieved party's knowledge of possible fault must be commensurately exacting. *E. g., Alfone v. Sarno, supra; cf. Moran v. Napolitano, supra,* 71 *N.J.* at 138–139 (in application of discovery rule, there is special need for a hearing where malpractice involves improper treatment that is not a "self-evident negligence situation" and "the matter of the negligence of the treating physician [is] more dubious").

According to plaintiff's uncontradicted testimony in this case, Dr. Rubacky assured and reassured her that her condition was the result of the "healing process." Defendant's own office notes concerning plaintiff's treatment corroborate her testimony that Dr. Rubacky believed that her ankle was healing and that a proper regimen for her was to test and use it as much as possible notwithstanding her complaints of pain and swelling. It is no wonder that plaintiff testified, "I believed [him] when he kept telling me it was the healing process. When any person puts themselves in the hands of a doctor they have to believe what he says whether they think it is right or wrong." A patient frequently is ignorant of her true medical and physiological condition and must repose trust and confidence in the doctor. Understandably, there is a normal reluctance on the part of a patient to suspect malpractice or impute medical fault to her physician. *Cf. Fernandi v. Strully, supra,* 35 *N.J.* at 441–442 (tolling of statute of limitations in medical malpractice action "present[s] special considerations" such as "confidential doctor-patient relationship" and "the patient's total ignorance during the customary period of limitations of [the fact of malpractice] or of circumstances suggesting it ..."); see also *Alfone v. Sarno, supra.*

The fact that plaintiff here sensed that something was "wrong" with her ankle and was "dissatisfied" with her treat-

ment is not incompatible with a belief that her doctor was treating her fully in accordance with proper medical standards. It is well accepted in this jurisdiction that medicine is not an exact science, *Newmark v. Gimbel's Incorporated,* 54 *N.J.* 585, 596–597 (1969), *Schueler v. Strelinger,* 43 *N.J.* 330, 334 (1964), and it is generally understood that a physician is not a guarantor that no harm or unfavorable consequences will arise from his treatment. *Germann v. Matriss,* 55 *N.J.* 193, 208 (1970).

Moreover, as in this case, a doctor's repeated assurances of progress may reinforce the reluctance of an average patient to find medical fault. Hence, it is extremely unlikely that Mrs. Lynch, who was consistently encouraged by Dr. Rubacky's optimistic prognoses of healing, sensed the real possibility of malpractice. *E. g., Alfone v. Sarno, supra,* 139 *N.J.Super.* at 524–525 (evidence did "not support a finding that under the circumstances there should have existed in her mind a disbelief in her physician or a suspicion that he himself was at fault. Quite the contrary—he was giving her assurance."); *Yerzy v. Levine, supra,* 108 *N.J.Super.* at 224 (as to post operative bile drainage, later claimed to have been caused by negligently performed gall bladder operation, defendant physician had earlier "suggested that plaintiff 'wait and see, perhaps nature will take care of it and it will close up by itself.' "). Certainly, it would be inequitable for a physician who has given such assurances to claim that a patient, in relying upon them and not suspecting their falsity or inaccuracy, failed to exercise the "reasonable diligence and intelligence" required by the discovery rule. Thus, in this case, the trial court did not ascribe knowledge of medical fault or a lack of due diligence to the plaintiff while she was still under the care of Dr. Rubacky.

The lower court, nevertheless, decided that the scales of ignorance suddenly vanished upon plaintiff's initial consultation with Dr. Argiroff in February 1974. It apparently determined that Mrs. Lynch then knew or should have "discovered" the malpractice committed upon her by Dr. Rubacky.

To the contrary, plaintiff's decision to seek the advice of another physician cannot be regarded as conclusive evidence that, by that time, she not only disbelieved Dr. Rubacky but she also fully suspected that he was guilty of medical malpractice. The decision to seek a second medical opinion in the face of unresolved medical problems is not uncommon and is a commendable course of action generally to be encouraged. See Department of Health, Education & Welfare, "The Impact of Second Opinions," *Forum*, Vol. 2, No. 5, pp. 2–9 (1978); L. Williams, M.D., *How to Avoid Unnecessary Surgery*, (1971), pp. v–xii, 31–45. There is no suggestion that in seeking out Dr. Argiroff plaintiff then had any reason to believe that Dr. Rubacky had rendered improper medical treatment.

Moreover, as noted by the trial court, Dr. Argiroff did nothing in the initial course of his treatment of Mrs. Lynch to discredit or cast Dr. Rubacky in a professionally unfavorable light. When plaintiff first conferred with Dr. Argiroff in February and was advised of the need for additional surgery, he did not at that time plant in plaintiff's mind any seed of suspicion against Dr. Rubacky. She was confronted simply with a different medical opinion. There is no sufficient factual indication in the record that plaintiff, in the exercise of reasonable diligence and intelligence, should thereafter have done anything more than follow the medical advice of Dr. Argiroff. Nor is there any factual basis in the record showing that had she made more pointed inquiries concerning her past medical treatment she would have been rewarded with any information tending to impugn Dr. Rubacky. Indeed, when Dr. Argiroff later, in May 1974, first voiced the opinion that Dr. Rubacky had been at fault, he also stressed that he did not want "to point a finger at anyone" or become involved in any malpractice charge. *Cf. Yerzy v. Levine*, 57 *N.J.* at 235 (failure of physician performing a subsequent operation to have advised plaintiff that earlier surgery was improper is an equity in patient's favor and should be "take[n] into account" in discovery rule determination.)

Thus, all of the factors militating against adequate knowledge of physician fault coalesce in this case. Plaintiff was ignorant of the true physical condition of her injured ankle. She reposed total confidence in Dr. Rubacky who continually assured her that the pain and swelling were part of the healing process. When Dr. Rubacky told her that there was nothing physically wrong with her and that she needed to see a psychiatrist, plaintiff, prudently, sought another opinion. However, her second physician did not for months arouse her suspicions of past malpractice; he gave no intimation that something was medically awry in the plaintiff's previous professional care or that the reasons for the physical difficulties she was experiencing might be attributable to faulty medical treatment of her former physician. Revelation of such matters did not occur until May 1974.

Hence, the ultimate conclusion that plaintiff failed on and after February 1974 either to act upon a state of knowledge of an actionable malpractice claim or to show reasonable diligence and intelligence to ferret out such a claim is not supported by the facts developed in the *Lopez* hearing. On the record of that hearing, the only legal conclusion which fairly can be drawn from the evidence is that plaintiff acted reasonably in attending to her medical needs; she was not remiss or sluggish in her own care. And she is not to be blamed because she did not have knowledge of material facts sufficient to generate the belief or suspicion that her course of treatment with Dr. Rubacky was improper until Dr. Argiroff so advised her in May 1974.

### III

Defendant has not in this case made any claim that he has suffered peculiar or unusual prejudice as a result of plaintiff's commencement of her present action almost two years after the accrual of her cause of action on May 24, 1974. *Fox v. Passaic General Hospital*, 71 *N.J.* 122 (1976). We perceive no sound reason to depart from the *Fox* ruling. An injured party, who is

compelled though no fault of his own to invoke the discovery rule, should not lose his statutory entitlement under *N.J.S.A.* 2A:14–2 to a two-year period within which to initiate a personal injury suit. A claimant should not be penalized because he has had the complicating misfortune of not realizing that he has in fact been victimized by a tortfeasor—in the sense either that he was hurt at all or that the injury he has suffered was caused by a wrongdoer. We hold, therefore, that plaintiff's claim in this case is not barred by the statute of limitations.

Accordingly, the judgment below is reversed.

CLIFFORD and SCHREIBER, JJ., dissenting.

For some time now we have sought to persuade the Court to adopt this rule of law: when a plaintiff in personal injury litigation, prior to the expiration of the two-year time limit of the statute of limitations, *N.J.S.A.* 2A:14–2, discovers or reasonably should discover those facts that the law equates with a cause of action, he must proceed with reasonable diligence to bring suit within so much of the two-year period as remains unexpired. This rule would give a plaintiff the benefit of an "expanded" statute of limitations only upon a showing that under the particular circumstances he had insufficient time expeditiously to file his complaint between discovery and expiration of the statutory period.

Thrice have we labored in vain to convince a majority of our brethren to accept this view. See *Burd v. New Jersey Tel. Co.*, 76 *N.J.* 284, 293 (1978) (concurring opinion); *Moran v. Napolitano*, 71 *N.J.* 133, 142 (1976) (dissenting opinion); *Fox v. Passaic General Hospital*, 71 *N.J.* 122, 128 (1976) (dissenting opinion). Given the notable lack of success of these efforts, one might reasonably conclude that the time has come to abandon the cause—if not out of respect for stare decisis, then in keeping with the wisdom of the Talmud as reported by Justice Frankfurter:

The Talmud says that if, when you are stone sober, a man tells you that you are drunk, knock his teeth out; if two men tell you that, laugh at them; but if three men tell you that, go to bed.[1]

But we persist in the endeavor, not because we think we can improve on the expression of our position as set forth in the three opinions referred to above, but because the facts of this case so strongly reinforce that position.

The statute of limitations would ordinarily begin to run at the time of defendant's alleged tortious conduct—here, January 23, 1974[2]—and would expire two years later, in January 1976. Although plaintiff did not consult her present counsel until April 1976, she was represented by a different lawyer in connection with a related personal injury suit during the entire two-year period from January 1974 to January 1976. That suit involved plaintiff's claim against the landlord of the premises upon which she fell in December 1972 and sustained the injuries for which Dr. Rubacky furnished treatment. Her attorney in that case, a seasoned and able practitioner in personal injury litigation, started suit against the landlord in January 1974. He settled the case around April 1976 (the Stipulation of Dismissal was filed May 6, 1976), having indicated complete disinterest in pursing plaintiff's malpractice claim. Immediately after that settlement, on May 17, 1976, present counsel commenced the instant action.

Although one might wonder about plaintiff's selection of different attorneys to prosecute claims so obviously interrelated,

---

[1]Letter from Felix Frankfurter to Jerome N. Frank (undated), reprinted in 61 *Cornell L.Rev.* 950, 977 & n. 141 (1976).

[2]It is not entirely clear from the majority opinion what defendant's alleged dereliction was or when it occurred. At oral argument counsel asserted that the malpractice consisted of improper post-operative care, particularly with respect to advice about weight bearing. Fixing January 23, 1974, the last occasion on which defendant rendered treatment, as the time of the alleged tortious act for purposes of triggering the statute of limitations gives plaintiff the benefit of any doubt and is consistent with the doctrine of continuous course of treatment. See *Tortorello v. Reinfeld*, 6 *N.J.* 58, 66 (1950).

that circumstance is not in itself significant. What *is* significant is that for the entire two years from January 1974 plaintiff was not unguided or without counsel to advise her on the necessity for expeditious filing of any claim against her physician. She had a lawyer at the very time she says she discovered her cause of action against the doctor in May 1974. The interrelationship between the claim against the landlord and the claim against the treating physician is readily apparent.[3] That interrelationship doubtless created an awkward problem of effective presentation of the separate claims; but we fail to discern any equitable considerations flowing from that circumstance that should in any way inure to plaintiff's benefit in a statute of limitations context. The fact remains that from the time Mrs. Lynch claims she discovered her cause of action against Dr. Rubacky, there remained twenty months within which to file suit against him—the unexpired balance of the two years from the date of his alleged malpractice in January 1974.

Whether plaintiff's failure to have started suit within that time was a matter of "strategy," so that she would not have the two interrelated personal injury claims unresolved and in litigation simultaneously, is a matter about which one can only conjecture. No explanation is offered. In the absence of any explanation, or in the face of an explanation grounded in litigation strategy, we would think it beyond question that a policy favoring diligent pursuit of lawsuits should prevail.

Plaintiff's suit, not having been filed within the twenty months of the unexpired statute of limitations remaining after discovery of her cause of action, should be barred.

---

[3]For example, it could not have escaped the attention of plaintiff's lawyer that the landlord was potentially liable for *all* the injuries proximately resulting from the initial tort, including, of course, the consequences of the medical treatment caused by the landlord's wrong. See *Ciluffo v. Middlesex Gen. Hosp.*, 146 *N.J.Super.* 476, 482 (App.Div.1977); *Knutsen v. Brown*, 96 *N.J.Super.* 229, 235 (App.Div.1967); Annotation, "Torts—Negligent Treatment of Injury," 100 *A.L.R.2d* 808, 813 (1965).

Moreover, under straightforward application of *Lopez v. Swyer*, 62 *N.J.* 267 (1973), and *Burd v. N.J. Tel. Co.*, 76 *N.J.* 284 (1978), the judgment below should be affirmed, even without the wrinkle or modification we have sought thus far unavailingly to inject into the law developed in those cases. The discovery rule provides that "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or *by an exercise of reasonable diligence and intelligence should have discovered* that he may have a basis for an actionable claim." *Lopez v. Swyer, supra,* 62 *N.J.* at 272 (emphasis added). This statement has been characterized as the "essence of the rule." *Burd v. N.J. Tel. Co., supra,* 76 *N.J.* at 287. In *Lopez* the Court affirmed the Appellate Division's decision to remand for a hearing on "the question as to when plaintiffs knew or should reasonably have known the nature of [plaintiff's] illness and its causal relationship with the alleged negligence." 62 *N.J.* at 272. The burden of proof rested on the plaintiff. *Id.* at 276. The Court in *Burd* ruled that the discovery principle was not dependent upon plaintiff's knowledge or lack of knowledge that a cause of action existed, but rather upon the plaintiff's awareness of the underlying state of facts which could serve as the framework for a cause of action. *Burd* commented on this aspect of the discovery rule as follows:

> The statute of limitations necessarily imputes conclusively to a claimant knowledge that the law affords or may afford a cause of action on the basis of those facts of injury and causal relationship which in law do evoke a cause of action. In this regard it is of no consequence whether the cause of action arises in the field of products liability or any other aspect of tort law, or as to the degree of expertise which different lawyers possess in one such field or another. The discovery principle modifies the conventional limitations rule only to the extent of postponing the commencement of accrual of the cause of action until plaintiff learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action. [76 *N.J.* at 291 (emphasis in original).]

The key elements are knowledge of injury and knowledge of its cause. This knowledge, actual or constructive, must suggest the fault of another. The test to be applied is objective:

whether a reasonably prudent person under the circumstances should have known or discovered these factors. Both the trial court and Appellate Division in the instant case acknowledged and applied these elements of the discovery rule derived from *Lopez* and *Burd.* An examination of the record discloses abundant evidence in support of the trial court's conclusion that "plaintiff by the exercise of reasonable diligence should have known or discovered a basis for an actionable claim against this defendant no later than February of 1974," wherefore the complaint, having been filed more than two years thereafter, was properly dismissed.

Defendant, Dr. Rubacky, treated plaintiff for a fracture of the right ankle due to a fall on her landlord's premises in December 1972. On January 4, 1973, he inserted three pins in her ankle as part of an operation. At visits in March, April and May plaintiff complained about severe pain and swelling. Although in May she was told not to come back until October, plaintiff returned in July complaining of indescribable pain. Dr. Rubacky x-rayed the ankle and told her there was nothing wrong with it. She then asked him to examine the x-rays more carefully, saying, "It can't be fine. I am in too much pain. There has to be something wrong." Upon reexamination he admitted that a pin was slipping out of place. Although he removed the pin in a second operation in July 1973, the pain and swelling in plaintiff's ankle persisted, making it impossible for her to stand for any length of time. Thereafter, Dr. Rubacky assured plaintiff that her ankle was fine and intimated that the only ailment preventing her return to her job as a hairdresser was her lack of desire to work.

When plaintiff last saw Dr. Rubacky on January 23, 1974, he told her that her ankle was "completed healed" and she was imagining the pain. He suggested that she see a psychiatrist and return in six months. She went home after this visit and immediately made an appointment to consult Dr. Argiroff, an

orthopedic surgeon. He examined plaintiff on February 12, 1974 and told her "there would have to be another operation or [her] ankle would never be any better." This third operation was performed on February 21, 1974, when Dr. Argiroff removed another loose pin in the ankle. His preoperative diagnosis had been: "Old fracture dislocation of a right ankle, with disruption of the ankle mortise, and loose Steinman pin in the ankle joint."

In the face of these widely—even wildly—divergent opinions rendered in such close proximity by Drs. Rubacky and Argiroff, reasonable diligence would require plaintiff to ask *why* it was she needed yet a third operation. She could have asked Dr. Argiroff. She could have sought an opinion from still another physician. She could have raised the question with the lawyer representing her in the fall-down case. It matters not that when Dr. Argiroff told plaintiff of the need for further surgical intervention "he did not at that time plant in plaintiff's mind any seed of suspicion against Dr. Rubacky", *ante* at 76. What does matter is that plaintiff's natural suspicions should reasonably have been awakened without any further hints or additional help from Dr. Argiroff, that she should have acted upon those suspicions, and that she did not.

Facts revealed at the *Lopez* hearing below further support this application of the discovery rule. Plaintiff testified that in 1973 she thought that if the operation by Dr. Rubacky had been performed properly, the pain would have subsided. In her words the unremitting pain indicated to her that "there was something wrong." She also said that as the pain persisted during 1973, she became dissatisfied with the doctor's treatment. She felt that he treated her "very badly," and told him that she strongly disagreed with his assertions that her ankle was healed. Plaintiff further testified that she went to Dr. Argiroff because she was not satisfied with Dr. Rubacky's treatment and wanted some relief from her pain.

Hence, the testimony demonstrates plaintiff's long-term dissatisfaction with Dr. Rubacky's insistence that her ankle was healed despite her pain and inability to stand for long periods of time. It shows that plaintiff immediately underwent a third operation when advised to do so by Dr. Argiroff. And it discloses, perhaps most significantly, plaintiff's belief that had Dr. Rubacky's treatment been rendered properly, her pain would have subsided. Even if all of this be insufficient to charge plaintiff with *actual* knowledge of Dr. Rubacky's dereliction, surely it is enough, when coupled with the contradictory medical advice, to demonstrate that by the exercise of the *Lopez* requirement of "reasonable diligence and intelligence" plaintiff should have discovered that she might have "a basis for an actionable claim." The trial court's conclusion in this regard was a reasonable factual determination, made, as *Lopez* envisions, "by a judge conscious of the equitable nature of the issues before him." 62 *N.J.* at 275.

Finally, no particular significance should attach to the fact that plaintiff acted reasonably in attending to her medical needs. *Ante* at 77. That observation by the majority effects a deft reformulation of the *Lopez* test, a subtle but not inconsequential shift from *Lopez's* requirement of reasonable diligence in ascertaining the basis for a claim to a markedly less demanding requirement of reasonable diligence and intelligence in attending to one's medical needs. This so severely waters down one critical element of the *Lopez* test as very nearly to wash it away.

We would affirm.

POLLOCK, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, HANDLER and POLLOCK—5.

*For affirmance*—Justices CLIFFORD and SCHREIBER—2.