JOYCE LINDSEY et al., Appellants, v A. H. ROBINS COMPANY, INC., Respondent, et al., Defendant.

Second Department, January 17, 1983

**APPEARANCES OF COUNSEL**

*Reardon & Sclafani, P. C. (Walter T. Reardon* of counsel), for appellants.

*Gair, Gair & Conason, P. C. (Herman Schmertz* of counsel), for respondent.

*Anthony L. Schiavetti (Arthur N. Seiff* of counsel), for Joel Ullman, defendant.

OPINION OF THE COURT

NIEHOFF, J.

■ On this appeal the principal issue we are called upon to decide is whether plaintiff Joyce Lindsey's causes of action sounding in strict products liability against defendant A. H. Robins Company, Inc. accrued at the time of insertion of the product manufactured by Robins (a Dalkon Shield intrauterine device) or at the time of onset of pelvic infection at which time Mrs. Lindsey sustained physical injury because of the allegedly defective product. For the reasons stated hereinafter, we conclude that such cause of action accrued as of the onset of the infection which produced physical injury.

The central facts are not in dispute.

On March 29, 1971 plaintiff Joyce Lindsey consulted with defendant Joel Ullman, M.D. on the subject of birth control. At that time Joyce Lindsey was 26 years of age and was married to plaintiff Ron Lindsey. They were the parents of one child. On that same day Dr. Ullman inserted into the uterus of Mrs. Lindsey an intrauterine device known as a Dalkon Shield which had been manufactured by defendant A. H. Robins Company, Inc. The Dalkon Shield intrauterine device is a plastic circle with spokes along the circumference to which is attached a braided string which trails from the uterus in order to let the user know that the shield is in place. It is a fixed device which remains in the uterus, until removal, to serve a continuing function of preventing conception.

Mrs. Lindsey experienced no problems by reason of the presence of the Dalkon Shield until March of 1973. At that time Mrs. Lindsey developed a pelvic infection which plaintiffs claim resulted from the fact that the shield was defectively designed and/or manufactured. It is contended that as a result of the pelvic infection, Mrs. Lindsey sustained permanent damage to her ovaries and fallopian tubes as a consequence of which she is no longer able to bear children.

In October, 1975, the plaintiffs initiated a lawsuit in the Federal Court in the Southern District of New York against Dr. Ullman and A. H. Robins Company, Inc. Be-

cause there was no diversity of citizenship to sustain the Federal action, the suit was voluntarily discontinued with the consent of the defendants. In February, 1976 the present action was instituted in the Supreme Court, Westchester County.

In April, 1981 defendant Robins moved to dismiss the complaint as against it upon the ground that the action was barred by the applicable Statute of Limitations. Defendant Dr. Ullman cross-moved to dismiss the complaint against him upon the same ground. In addition to opposing the defendants' motions the plaintiffs cross-moved for leave to serve an amended complaint against Robins wherein it would be claimed that said defendant had committed fraud because it had concealed the defective nature and dangerous propensities of the shield from the public as well as the Food and Drug Administration. On said cross motion plaintiffs also sought to strike the affirmative defense of the Statute of Limitations and to vacate or stay the 90-day notice served by Dr. Ullman. Alternatively, plaintiffs sought leave to file a note of issue and statement of readiness and a direction that Robins produce certain enumerated employees for deposition. In support of the cross motion the plaintiffs included a medical affidavit from an examining physician who stated that no injury had occurred to Mrs. Lindsey immediately upon the insertion of the Dalkon Shield but that her "injury first occurred in the beginning of March 1973, a few days or weeks before the episode of sub-acute salpingitis which was diagnosed at Mt. Vernon Hospital". The plaintiffs claim that such medical conclusion was premised upon the fact that this type of infection was known to have a two to three week incubation or gestation period.

By order dated August 10, 1981, Special Term (1) granted the motion of Robins to dismiss the complaint against it on Statute of Limitations grounds; (2) granted the cross motion of Dr. Ullman to dismiss the complaint against him only to the extent of dismissing so much of the complaint as sought damages for acts committed more than three years prior to the service of process in the Federal Court action; (3) denied plaintiffs' cross motion insofar as it sought to add causes of action against Robins

alleging fraud; (4) denied plaintiffs' cross motion insofar as it sought a dismissal of defendants' affirmative defense; and (5) held that the portion of the cross motion directed at the 90-day notice served by Dr. Ullman had been rendered moot since no further discovery of defendant Robins could be had.

The nub of Special Term's decision on the Statute of Limitations question is found in these words from its memorandum decision: "The question presented on defendants' motions is whether the Statute of Limitations began to run on the day the allegedly defective 'Dalkon Shield' intrauterine device was inserted into plaintiff Joyce Lindsey or whether the limitation of time should be measured from the onset of the injury claimed, in this case a pelvic infection. This Court is constrained to agree with the position of defendants that the decision of the Court of Appeals in *Thornton v. Roosevelt Hospital,* 47 N.Y. 2d 780, is controlling and mandates a holding that the cause of action accrued upon introduction of the IUD. In my opinion there is little qualitative difference between the injection of a hazardous radioactive dye, as in *Thornton,* and the introduction into the body of the allegedly defective contraceptive device."

Thus, it will be seen that Special Term reached its determination that plaintiffs' action was time barred on constraint of *Thornton v Roosevelt Hosp.* (47 NY2d 780). Other courts at Special Term have also come to the same conclusion in cases involving such device, namely, that the Statute of Limitations begins to run as of the moment the device is inserted into the body (see, in particular, *Fitzpatrick v Robins Co.,* Supreme Ct, Nassau County, Aug. 20, 1982 [VITALE, J.]; *Weinrich v Robins Co.,* Supreme Ct, Queens County, July 2, 1982 [LEVISS, J.]; *Rivera v Robins Co.,* Supreme Ct, NY County, June 3, 1982 [FRAIMAN, J.]; *Whitman v Schwartz,* Supreme Ct, Nassau County, Dec. 22, 1981 [SPATT, J.]; *Forbath v Robins Co.,* Supreme Ct, Nassau County, July 17, 1980 [ALTIMARI, J.]; *Borelli v Robins Co.,* Supreme Ct, Nassau County, April 25, 1980 [MURPHY, J.]).

On the other hand, at least two courts have ruled otherwise (see *Stein v Robins Co.,* NYLJ, June 23, 1981, p 6, col

4; *Manookian v Robins Co.*, US Dist Ct, EDNY [MISHLER, J.]).

Accordingly, a careful analysis of plaintiffs' claim and the holding in the *Thornton* case is mandated.

The theory of the plaintiffs' claim against defendant Robins is that Joyce Lindsey was caused to sustain the pelvic infection because the braided string or wick attached to the shield constituted an "open highway" inviting invasion by bacteria. Stated otherwise, the plaintiffs contend that because the braided string or multifilament tail functions like a wick, collecting bacteria and contributing to a high incidence of uterine infections, the shield was defectively designed and/or manufactured. In their complaint, the plaintiffs claim that Robins (1) failed "to properly design, test and manufacture the IUD"; (2) "did expressly and impliedly warrant the IUD of its manufacture as to safety, fitness, efficacy and merchantability"; and (3) "is liable to the plaintiff under the doctrine of strict liability". In their bill of particulars the plaintiffs assert that: "the Dalkon Shield was dangerous, defective and unsafe, and that the device harbors bacteria and becomes contaminated by bacteria; that infections result from such bacterial contamination and that such infections are dangerous both to the plaintiff's immediate health and her future ability to bear children."

In *Victorson v Bock Laundry Mach. Co.* (37 NY2d 395, 399-400), the Court of Appeals held that the period of limitations with respect to strict products liability claims "begins to run at the date of injury and that the duration of such period is that found in CPLR 214 (subds 4, 5) under which there is a limitation of three years in actions for personal injury and property damage". Thus, *Victorson* clearly and unequivocally lays down the rule that the cause of action in strict products liability cases accrues when the product causes physical injury. That is, the cause of action accrues at the time of actual harm and not at the time the defect is created or when the defective mechanism is purchased or first utilized. Therefore, in a strict products liability case, it is necessary to distinguish between the time the allegedly defective product is marketed and the

time of the injury, for it is the latter which controls the running of the Statute of Limitations.

In *Thornton v Roosevelt Hosp.* (47 NY2d 780, 781, *supra*), relied on by Special Term, which involved a thorium dioxide substance injected into decedent allegedly resulting in the onset of cancer, the Court of Appeals made reference in its opinion to the *Victorson* rule and then said: "Nowhere did the court state, or even suggest, that the social policies upon which the holding in *Victorson* was predicated might prompt a change in the traditional principle that a cause of action grounded in tort commences as of the date of injury."

Having so stated the Court of Appeals went on to say in *Thornton* (p 781): "It is well established in this State that when chemical compounds are injected into a person's body, the injury occurs upon the drugs introduction, not when the alleged deleterious effects of its component chemicals become apparent. (*Schwartz v Heyden Newport Chem. Corp.*, 12 NY2d 212, cert den 374 US 808.) Here, plaintiff's claim being interposed some 20 years after the decedent's injection — the date of injury — the action is time-barred, irrespective of whether the cause of action is couched in terms of strict products liability."

Although *Thornton* (*supra*) declares in the clearest of language that it is well established that for Statute of Limitations purposes the injury occurs at the moment chemical compounds are injected into a person's body rather than at the time the alleged deleterious effects of its components become apparent, *Thornton* does not spell out the rationale underlying that rule. Hence, to find the rationale behind the rule we must look to other cases which appear to constitute the foundation stones upon which *Thornton* rests, namely *Schmidt v Merchants Desp. Transp. Co.* (270 NY 287) and *Schwartz v Heyden Newport Chem. Corp.* (12 NY2d 212, cert den 374 US 808).

In *Schmidt* (*supra*) the Court of Appeals was concerned with a case in which the plaintiff, while in the employ of the defendant, inhaled foreign substances in the form of dust as a consequence of which he contracted a disease of the lungs known as pneumoconiosis.

The plaintiff claimed that his cause of action accrued at the time when the dust, so inhaled, resulted in a disease,

not at the time he inhaled the dust. The Court of Appeals rejected that argument holding that it was the inhalation of the dust that constituted the actionable wrongful invasion of the plaintiff's right, and that the subsequent onset of consequential damages did not ripen into a new cause of action for Statute of Limitations purposes. The court wrote these words (*Schmidt v Merchants Desp. Transp. Co.,* p 301): "The injury to the plaintiff was complete when the alleged negligence of the defendant caused the plaintiff to inhale the deleterious dust. For that injury, including all resulting damages the defendant was then liable. The disease of the lungs was a consequence of that injury. Its result might be delayed or, perhaps, even by good fortune averted; nevertheless, the disease resulted naturally, if not inevitably, from a condition created in the plaintiff's body through the defendant's alleged wrong."

Recently, in *Matter of Steinhardt v Johns-Manville Corp.* (54 NY2d 1008), a case in which the plaintiffs sought damages for injuries caused by the inhalation of asbestos particles by plaintiffs or their decedents during employment, a majority of the Court of Appeals reaffirmed the principle announced in *Schmidt* and held that the Statute of Limitations runs from the date of the last exposure to the invading substance rather than from the date on which the various plaintiffs discovered their asbestos-related diseases.

In *Schwartz v Heyden Newport Chem. Corp.* (12 NY2d 212, *supra*) and *Thornton v Roosevelt Hosp.* (47 NY2d 780, *supra*) the Court of Appeals was confronted with the accrual date for Statute of Limitations purposes involving plaintiffs who suffered injury after receiving injections rather than plaintiffs who inhaled deleterious substances as was the case in *Schmidt* and *Steinhardt.*

In *Schwartz* (*supra*), the plaintiff was injected with a drug in 1944, sustained perceptible injury in 1957 and commenced his action for personal injuries in 1959. In affirming the dismissal of the complaint the Court of Appeals found that the facts in that case came within the holding of *Schmidt* (*supra*), the deleterious dust case. In so finding, a majority of the court declared that "Judge LEHMAN's view in the *Schmidt* case is right as we must assume

that the dust immediately acted upon Schmidt's lung tissue" (12 NY2d 212, 217, *supra*). Accordingly, it is clear that in applying the *Schmidt* rule to an injection case the court in *Schwartz* was saying that whether the harmful substance enters the body through inhalation or injection the assumption has to be the same, to wit, that the substance acts immediately on the tissue of the body, i.e., causes immediate injury to the body. That being so, the cause of action in such class of cases accrues upon the introduction of the harmful substance into the body.

As noted above, in reaching its conclusion in *Thornton* (*supra*), the Court of Appeals, in its memorandum decision, cited and followed *Schwartz* (*supra*).

So, we come to the critical question: is the rationale underlying the inhalation-injection class of cases discussed above applicable to the case at bar? As indicated in the opening paragraph of this opinion we are of the view that such rationale does not apply here.

As pointed out above, the inhalation-injection cases stand primarily for the proposition that when a harmful substance enters the body, or is taken internally, the injury occurs immediately. Those cases hold that it is the introduction of the deleterious substance into the body, through inhalation or injection, which constitutes the injury to a plaintiff and not the infection or disease which may ultimately be caused by the substance. In other words, the injection or inhalation of the harmful substance into the body constitutes the actionable "invasion of the body" which *immediately* initiates the infection or disease process for which a negligent defendant is responsible.

Indeed, as pointed out above, the Court of Appeals has explicitly declared that those cases are based upon an assumption, to wit, that the harmful substance taken into the body by inhalation or injection acts immediately upon the tissues of the body and causes injury immediately.

But, that assumption is not valid or applicable to the facts of the case before us. It cannot be said that there was injury at the time of the insertion of the shield because there is no basis in reason or in the record before us upon which to predicate an assumption that any infection or

disease process began immediately upon insertion of the shield. Unlike the harmful dust and chemical compounds, which were harmful in their very nature, i.e., they were the "beasts themselves", the shield was not, in and of itself, harmful. The "beasts" were the bacteria that availed themselves of the "open highway" created by the shield.

It is true that the alleged design defect upon which plaintiffs base their claim against Robins was present upon implantation. Nevertheless, it is only when (and if) infectious bacteria choose to follow the "open highway" — the alleged defect in the device — created by the braided string that the shield can be characterized as having become a harmful device. Up to that point in time it was only potentially harmful. Moreover, it appears from what is before us that both the type of infection and the incubation or gestation period of the offending bacteria can be established by the plaintiffs and that it can be medically determined when the organisms entered the uterus of plaintiff Joyce Lindsey and began the infection producing process. According to the medical proof submitted, Joyce Lindsey's "injury first occurred in the beginning of March, 1973" and "until this occasion in March, 1973 no injury to Mrs. Lindsey occurred due to the Dalkon Shield." Hence, as previously stated, unlike the inhalation-injection cases, it cannot be assumed here that upon insertion the shield began to set in motion the ultimate injurious effect. That being so, we conclude that the immediate injury rationale of the inhalation-injection cases distinguishes them from this matter and that said cases are not controlling in this case.

Another rationale of the inhalation-injection line of cases appears to be that the "breach of duty" owed by the defendant to the plaintiff had been completed more than three years before the actions had been commenced. In other words, after the inhalation or injection there was no nexus between the defendant and the plaintiff which caused any additional "injury" to the plaintiff. While such reasoning may be utilized in determining the rights of one who inhales a deleterious substance or is injected with a harmful substance to pursue his rights against the party legally responsible for his injury, in our judgment it cannot

be applied to a products liability case where a dormant, functioning, seemingly harmless mechanism remains in the implantee's body for some time before the defect results in injury.

The fact that Joyce Lindsey's injury came about because of an "invasion" of the body by bacteria which was allegedly facilitated by a design defect in the shield invites comparisons with the inhalation or injection of harmful substances cases. Nevertheless, in our opinion, it does not serve to make the *Schmidt-Schwartz-Thornton-Steinhardt* line of cases controlling. Manifestly, if the shield were defectively designed in such a way that one of the spokes disengaged and punctured an organ or if its defective design enabled the braided string to entwine and constrict an organ then there would be no question as to the applicability of the general strict products liability accrual rule. In this case we see no justification for departing from the general rule stated in *Victorson v Bock Laundry Mach. Co.* (37 NY2d 395, *supra*) and reaffirmed in *Thornton v Roosevelt Hosp.* (47 NY2d 780, *supra*) simply because the shield facilitated infectious injury instead of causing direct physical injury.

It must not be forgotten that we are dealing here with a product which was marketed for profit by Robins and we can perceive no sound reason why the policy behind the *Victorson* rule should not apply to such product. Because of the nature of the shield, it was hidden from view after insertion in the body. But, why should that fact start the Statute of Limitations running immediately rather than when the object causes injury? Those cases applying the general rule spelled out in *Victorson* (*supra*) distinguish between the time the allegedly defective product is placed into the mainstream of commerce and the time when the cause of action arises. The cause of action comes into being only when the product causes damage or injury, that is, upon the breakdown of the device. In our view, this case is analogous to the breakdown cases (see *Klein v Dow Corning Corp.*, 661 F2d 998, injury at a time a mammary prosthesis broke and not the date of insertion; *Murphy v St. Charles Hosp.*, 35 AD2d 64, injury at time prosthesis broke although it had been inserted years earlier). The "break-

down" here would be at the point at which the shield's tail conducted infectious bacteria up into the uterus. The bacteria, an outside agency, caused an infection, inflaming the pelvic area, and causing plaintiff Joyce Lindsey's injury. The cause of action accrued when that injury occurred, not at some earlier date when the shield had been inserted, but had not yet had a harmful effect on Joyce Lindsey.

In sum we hold that an intrauterine device which facilitates infection is significantly different from dust, asbestos particles, a hazardous dye, or a thorium dioxide substance which directly and immediately act upon the body causing injury and that the date of onset of injury rather than the date of insertion is the accrual date to be used for computing the limitation of the time for bringing suit in this kind of case.

On the record before us, we cannot say as a matter of law that this action is barred by the Statute of Limitations. Of course if at the trial of the action the evidence establishes that the infection process, which caused Mrs. Lindsey's injury, began more than three years before the commencement of said action, then Robins will be entitled to a dismissal on Statute of Limitations grounds.

For the foregoing reasons, Robins' motion for dismissal of the complaint as to it should have been denied and the cross motion of plaintiffs insofar as it was to strike the affirmative defense of the Statute of Limitations interposed by Robins should have been denied without prejudice to renewal at the trial.

However, we agree with Special Term that the new causes of action for fraud sought to be interposed by plaintiffs "present a wholly new theory of liability", that they cannot be held to relate back under the provisions of CPLR 203 (subd [e]) but are time barred, and that the documentation which allegedly supports this new theory was made available in 1978 through discovery. Accordingly, Special Term correctly denied that branch of the plaintiffs' cross motion which was to amend the complaint.

TITONE, J. P., GULOTTA and O'CONNOR, JJ., concur.

Appeal from order dated August 10, 1981, dismissed, without costs or disbursements. Said order was superseded by the order entered upon reargument.

Order dated October 13, 1981, reversed insofar as reviewed, on the law, without costs or disbursements, and upon reargument, order dated August 10, 1981 is modified by deleting therefrom the first and fourth decretal paragraphs and substituting therefor provisions denying defendant A. H. Robins Company, Inc.'s motion to dismiss the complaint as to it and denying the plaintiffs' cross motion insofar as it seeks to dismiss the affirmative defense of the Statute of Limitations interposed by defendant A. H. Robins Company, Inc. without prejudice to renewal at the trial of this action.