Lorraine M. COLAROSSI and Elizabeth D. Susman, Plaintiffs,

v.

SCHMID LABORATORIES, INC. and Schmid Products Corp., Defendants.

Civ. A. No. 92–5069 (AJL).

United States District Court, D. New Jersey.

July 15, 1993.

---

Elisa Barnes, Ho–Ho–Kus, NJ, and Sybil Shainwald, Law Office of Sybil Shainwald, New York City, for plaintiffs.

Anthony Marchetta, Hannoch Weisman, Roseland, NJ, for defendants.

OPINION

LECHNER, District Judge.

This is a personal injury action brought by plaintiffs Lorraine M. Colarossi ("Colarossi") and Elizabeth D. Susman ("Susman") (collectively, the "Plaintiffs") against defendants Schmid Laboratories, Inc. and Schmid Products Corp. (collectively, "Schmid"). Plaintiffs originally filed the complaint (the "Com-

plaint") in the U.S. District Court for the District of Columbia on 2 October 1992. By order, filed 20 October 1992 (the "Transfer Order"), the Complaint was then transferred to the U.S. District Court for the District of New Jersey pursuant to 28 U.S.C. § 1404(a), "in the interests of justice and where this action might have been filed." Transfer Order. Plaintiffs filed an amended complaint (the "Amended Complaint") on 21 December 1992. Jurisdiction is alleged pursuant to 28 U.S.C. § 1332.

Currently before the court is the motion of Schmid for summary judgment against Susman.[1] For the reasons set forth below, summary judgment is granted.

*Facts*

Susman, currently a resident of California, brought suit to recover for personal injuries sustained in 1978. Schmid is licensed or authorized to transact business in, transacts business in, markets its products in and intends the use of its products within the District of Columbia. Barnes Cert., Ex. B (Answer, ¶¶ 32–36).

In spring 1970, while living in New York City, Susman had an intrauterine device (an "IUD") inserted by Dr. Robert Hall ("Dr. Hall"). Susman Aff., ¶ 2, 4. The procedure was performed at Columbia Presbyterian Hospital in New York City. *Id.*, ¶ 2. Susman stated Dr. Hall only advised her that as a result of the IUD, she might experience heavier than usual menstrual bleeding. *Id.*, ¶ 3.

Susman wore the IUD for almost eight years, between 1970 until 1978, without any problem. *Id.*, ¶ 5. She went for yearly gynecological examinations, "but experienced no adverse reproductive tract health problems." *Id.* Between 1970 and 1978, Susman and her family moved from New York City to Greenwich, Connecticut to Puerto Rico and back to Connecticut. *Id.*, ¶ 6.

In February and March 1978,[2] Susman began to suffer increasingly severe abdominal pain, abdominal distension, cramping, fever, abnormal vaginal discharge and bleeding. *Id.*, ¶ 7. Susman's physician, Dr. Robert Hardy ("Dr. Hardy"), initially treated Susman with antibiotics. When the antibiotics failed to alleviate her symptoms, however, he admitted her to Greenwich Hospital (the "Hospital") on 8 March 1978. *Id.*, ¶ 8. Upon admission to the Hospital, Dr. Hardy removed Susman's IUD and discovered a large pelvic mass. When treatment with intravenous antibiotics had no effect, on 9 March 1978, Dr. Hardy operated. *Id.*, ¶ 9.

> Dr. Hardy performed a laparoscopy at which time he discovered a large pelvic abscess involving the posterior uterus, tubes, ovaries and portions of the bowel. [Her] left fallopian tube was infected to the point that it was not salvageable and had to be removed.

*Id.* Pursuant to Susman's request that, if possible, Dr. Hardy not remove any reproductive organs so that she might have more children, her right fallopian tube and ovary were not removed. *Id.*, ¶ 10.

From March to September 1978, however, Susman continued to experience severe pelvic pain and irregular menstrual periods. *Id.*, ¶ 11. Dr. Hardy diagnosed Susman as suffering from chronic pelvic inflammatory disease ("PID"). On 19 September 1978, Susman was again hospitalized. After ex-

---

1. In support of its motion, Schmid submitted the following: Memorandum of Law in Support of Motion for Summary Judgment by Defendants Schmid Laboratories, Inc. and Schmid Products Company against Plaintiff Elizabeth D. Susman ("Schmid Brief"), Letter–Brief in Reply ("Schmid Reply"), Certification of Linda Romano McGloin, Esq. in Support of Defendants'· Motion for Summary Judgment against Plaintiff Elizabeth Susman ("McGloin Cert."), Affidavit of Robert Kaiser, Esq. in Support of Motion for Summary Judgment by Schmid Laboratories, Inc. and Schmid Products Corp. ("Kaiser Aff.").

In opposition to the motion, Susman submitted the following: Memorandum of Law in Opposi-

tion to *Defendants' Motion for Summary Judgment on Behalf of Plaintiff Elizabeth Susman* (the "Susman Opp."), Affidavit of Plaintiff Elizabeth Susman in Opposition to Defendants' Motion for Summary Judgment ("Susman Aff."), Certification of Elisa Barnes, Esq. in Opposition to Defendants' Motion for Summary Judgment ("Barnes Cert."), Affidavit of Sybil Shainwald in *Opposition to Defendants' Motion for Summary Judgment* ("Shainwald Aff.").

Oral argument was heard on 12 July 1993. References to the transcript will be cited as "Tr. at ——."

2. Susman was thirty-eight years old in 1978. McGloin Cert., Ex. B, § A(2).

ploratory surgery by Dr. Hardy, Susman underwent a total abdominal hysterectomy including removal of her right fallopian tube and ovary. *Id.* She was subsequently readmitted on 6 October 1978 for re-suturing of her vaginal vault because she experienced excessive bleeding. *Id.* Susman stated that "[a]fter the second surgery, Dr. Hardy informed [her] that [her] pelvic infection might have been caused by the IUD." [3] *Id.*, ¶ 12.

Following the second surgery, Susman and her husband divorced. Susman then moved from Connecticut to California. *Id.*, ¶ 14.

Susman stated she and her ex-husband believed she had worn a Dalkon Shield. *Id.*, ¶ 16. Susman stated she had not known PID and her subsequent injuries were the result of anyone's fault or any wrongdoing on the part of the manufacturer of the IUD. *Id.*, ¶ 15. It was not until Susman read about the Dalkon Shield litigation in 1986 she gained knowledge there might be anything wrong with the IUD. *Id.*

Susman stated:

Sometime in 1986, [she] first became aware of publicity surrounding the adverse effects of the Dalkon Shield and that the problems suffered by women who wore the Shield were the subject of law suits for damages due to the defects of the product. In early 1986, [she] recall[ed] seeing articles in the print media—newspapers and magazines—regarding these allegations and advertising the claim filing mechanism set up by the Dalkon Shield [Claimants] Trust in order to compensate women who had suffered injuries as a result of wearing the Shield.

*Id.*, ¶ 17.[4] Susman filed an initial claim with the Dalkon Shield Claimants Trust sometime in 1986. *Id.*, ¶ 18.

Susman stated there was little movement of her case between 1986 and 1989. *Id.*, ¶ 19. In 1989, Susman engaged Sarah Lawrence, Esq. ("Lawrence") to represent her in the Dalkon Shield litigation.[5] In 1991, Susman requested that Lawrence send to her her

3. It appears from Susman's Dalkon Shield User Claim Form (the "Claim Form") she was first told by Dr. Hardy that her medical problems might have been caused by her IUD around March 1978. McGloin Cert., Ex. B., § F(18).

4. Sybil Shainwald ("Shainwald"), one of Susman's present attorneys, stated she is familiar with the procedures implemented by the Dalkon Shield Claimants Trust for processing the claims of injured women. Shainwald Aff., ¶ 1. She stated that on 21 August 1985, A.H. Robins & Co. ("Robins"), the manufacturer of the Dalkon Shield, filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. *Id.*, ¶ 3. The district court gave claimants until 30 April 1986 to file claims against Robins. Claims filed after that date would be disallowed. Robins then began a broad international campaign to notify the public of the bar date and the procedure for filing claims. *Id.*, ¶ 4.

Shainwald stated that Susman, upon reading the publicity about the Dalkon Shield, filed a claim against Robins in January 1986. *Id.*, ¶ 5. As required, Susman mailed a postcard to Robins including her name, address and an indication she was making a claim. Robins then mailed Susman a questionnaire. The questionnaire was to be returned by 30 June 1986. However, because less than one half of the people sent questionnaires responded by 30 June 1986, the court ordered a second questionnaire with a later return date. *Id.*, ¶ 7.

The Robins bankruptcy resulted in a reorganization and a 2.5 billion dollar fund for compensating Dalkon Shield claimants. *Id.*, ¶ 8. In early 1990, the Dalkon Shield Claimants Trust mailed packets to claimants explaining the four options available to claimants. *Id.*, ¶ 9. Susman chose Option III which required that she submit her entire medical record to the Trust for full indepth review of her claim. *Id.*, ¶ 10.

5. In relation to her claim against Robins, Susman completed the Claim Form which is signed by Susman and dated 30 April 1990. McGloin Cert., Ex. B. Section B of the Claim Form names and includes illustrations of five types of IUD's, including the Saf–T–Coil IUD, and explains:

Several different types of ... [IUD's] were sold in the United States as well as in other countries. These IUD's are pictured in the box below. Examples are the Lippes Loop, the *Saf–T–Coil*, the Copper 7, the Tatum "T" and the Dalkon Shield. In this section we ask about [your use] of the Dalkon Shield which was made by ... Robins.... A claim that a Dalkon Shield caused (or will cause) harm or damage will require you to establish in some manner that you used the Dalkon Shield. THE TRUST IS ONLY AUTHORIZED TO PAY FOR CLAIMS RESULTING FROM USE OF THE DALKON SHIELD.

*Id.* (underscoring emphasis added). The Claim Form then asks whether the claimant used the Dalkon Shield or another IUD. Susman responded in the Claim Form that she had used the Dalkon Shield.

medical records. Susman stated she had never seen the medical records prior to 1991. *Id.*, ¶ 19.

In March 1991, while reviewing her records, Susman observed Dr. Hardy's notation of 8 March 1978 which stated he removed from Susman a "Saf–T–Coil" IUD. *Id.*, ¶ 20; McGloin Cert., Ex. C. Susman immediately contacted her attorney[6] and subsequently discontinued her claim against the Dalkon Shield Claimants Trust. Susman Aff., ¶ 21. Lawrence advised Susman that although she did not have any experience litigating claims against the manufacturers of Saf–T–Coil, other attorneys in other parts of the country had such experience. *Id.*, ¶ 22. In March 1992, Susman contacted Shainwald, one of her present attorneys, about bringing the present action. *Id.*, ¶¶ 23–24.

The Amended Complaint includes four counts by Susman against Schmid. Counts Five[7] through Eight seek compensatory damages based on negligence, strict products liability, breach of warranty and misrepresentation. Amended Complaint, ¶¶ 41–58.

### Discussion

Schmid asserts summary judgment is appropriate because Susman's claim is barred by the statutes of limitations for the District of Columbia, New Jersey, New York, Connecticut and California. Susman argues in opposition to summary judgment that neither the statute of limitations for the District of Columbia nor the statute of limitations for New Jersey bars her claims.[8]

### A. Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("The threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted)); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test . . . (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). "'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a

---

**6.** It is unclear whether Susman's reference is to Lawrence or another attorney.

**7.** Counts One through Four involve claims by Colarossi against Schmid.

**8.** Susman did not consider in her briefs the application of the statutes of limitations for New York, Connecticut or California. In addition, at oral argument the parties were informed:

> Counsel, I have read your submissions three and, in some instances, four times. I'm thoroughly familiar with what has been submitted here, the facts in the case.
>
> Either or both of you asked for oral argument. I don't need it. Certainly I'm willing [to] give you the argument you need, but I don't need nor do I want you to repeat what's in the briefs or other submissions.
>
> Is there anything else you would like to offer.

Tr. at 2. Neither party sought to submit additional affidavits or proffered other evidence.

motion for summary judgment.'" *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson*: "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2552–53 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. see Fed.R.Civ.P. 56(e); *see also Gray*, 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the nonmoving party fails to 'establish the existence' of an element essential to the case").

### B. *Statute of Limitations*

The parties dispute in their briefs which statute of limitations should apply to Susman's personal injury claim. Because, however, Susman's claim is barred by the statutes of limitations for the District of Columbia, New Jersey, New York, Connecticut and California, it is unnecessary to delve into a choice of law analysis.

#### 1. *District of Columbia*

Susman asserts her claim is valid under the statute of limitations for the District of Columbia. Susman contends that, under the discovery rule, the statute of limitations did not begin to run against her until she contacted Shainwald in early 1992 and "discovered" Schmid had committed "wrongdoing." Susman Opp. at 12–16.

■ Under District of Columbia law, an action for negligence, strict liability or misrepresentation must be brought within three years after a cause of action accrues. D.C.Code § 12–301(8). Ordinarily a cause of

action accrues when an injury occurs. *Bussineau v. President and Directors of College*, 518 A.2d 423, 425 (D.C.App.1986); *Baker v. A.H. Robins Co.*, 613 F.Supp. 994, 996 (D.D.C.1985). However, in cases where the relationship between tortious conduct and subsequent injury may be obscure, the "discovery rule" may apply. *Bussineau*, 518 A.2d at 425; *Baker*, 613 F.Supp. at 996.

■ The court in *Bussineau* held: "[F]or a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." [9] 518 A.2d at 435; *see also Nelson v. American Nat. Red Cross*, 815 F.Supp. 501, 503 (D.D.C.1993).

The wrongdoing element of the discovery rule reflects a concern for lay persons who defer legal action because of assurances made by people with expertise such as doctors or other medical experts. *Bussineau*, 518 A.2d at 426–27 (dentists continuously reassured plaintiff her treatment was proper, statute of limitations did not commence until plaintiff consulted new doctor) (*see* cases cited therein).

In product liability cases such as *Dawson*, the rationale behind the wrongdoing element is that " '[a] claimant should not be penalized because he [or she] has had the complicating misfortune of not realizing that he has in fact been victimized by a tortfeasor.' " 543 F.Supp. at 1335 (quoting *Lynch v. Rubacky*, 85 N.J. 65, 424 A.2d 1169 (1981)). The statute of limitations will not begin to run "until [the plaintiff] knows, or through the exercise of due diligence, should know that his injury is the result of someone's wrongdoing." *Id.* at 1334. To meet the wrongdoing element, "[i]t merely means that [the plaintiff] had to have some awareness, or imputed awareness, that her injuries were the result of some

wrongdoing on the part of defendants." *Id.* at 1339.

The wrongdoing element does not, however, require that the plaintiff know the identity of the party responsible for the injury. In *Nelson*, plaintiff brought an action against the Red Cross for damages based on his father's death from an AIDS related illness. 815 F.Supp. at 502. In February 1985, the father was given a blood transfusion during surgery. In early fall 1986, the Red Cross informed the father's doctor that one of the units of blood given to the father had been contributed by someone who had subsequently tested positive for AIDS. The doctor promptly informed the father and in October 1986, the father tested positive for the HIV antibody. *Id.* The doctor informed the father of the implications of the situation and although the father was, at the time, asymptomatic, he would in all likelihood develop AIDS. According to the doctor, the father understood and was angry and distraught. The father began to exhibit symptoms in April 1987, the infection developed into AIDs by spring 1990 and he died in March 1991.

On motion by defendant, summary judgment was granted in favor of defendant because the statute of limitations barred suit. Applying the discovery rule, the court held the father was "injured" for limitations purposes when he received the contaminated transfusion. He "discovered" that he had been infected in October 1986. The court further held:

> He also knew how, when and by whom the infecting agent had been procured and introduced into his body. And he knew that the consequences were likely to be lethal. A tragedy had befallen him for which he was himself entirely innocent. "Wrongdoing" by someone was more than a hypothetical possibility.

*Id.* at 503. Although the father did not specifically know the defendant had commit-

---

**9.** As stated by the court in *Dawson v. Eli Lilly and Co.*, 543 F.Supp. 1330 (D.D.C.1982), accrual of a cause of action for purposes of the statute of limitations follows the following progression:

> Where the injury is latent, the claim is held not to accrue until the plaintiff discovers the injury. Where causation of an injury is unknown, the action accrues when both the injury and its

cause have been (or should have been) discovered. Where the injury and causation are known, but not that there has been any wrongdoing, the action is held to accrue when the plaintiff discovered, or by due diligence should have discovered, the wrongdoing.

*Id.* at 1338.

ted any wrongdoing, because he knew the above described information more than three years prior to his death, the statute of limitations barred recovery. *Id.* at 504.

In *Baker,* a case factually similar to the present action, plaintiff sued for personal injury caused by use of an IUD manufactured by Robins. The IUD was inserted in 1971 and worn without incident until April 1975 when the IUD was removed and plaintiff was diagnosed with PID. 613 F.Supp. at 995.

In January 1980, having read articles on the subject, plaintiff wrote to Robins asserting her entitlement to compensation for physical and emotional injuries. Her letter was forwarded to Robins' insurer and plaintiff was subsequently paid $15,000. In November 1983, plaintiff filed suit against Robins in Federal court. *Id.*

On motion by defendant, summary judgment was granted because the statute of limitations barred suit. The court held that in January 1980, plaintiff

> was fully cognizant of the fact that she had sustained injury to her reproductive organs and that defendant's product was the likely cause of that injury.... The fact that she did not then comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a *cause of action* for personal injury.

*Id.* at 996 (emphasis in original).

In the present case, it is undisputed Susman sustained her physical injuries during the course of 1978. Susman Aff., ¶¶ 7–12. It is also undisputed that Dr. Hardy informed Susman during 1978 that her IUD might have caused the infection and resultant injuries. *Id.,* ¶ 12; *see also* McGloin Cert., Ex. B, § F(18). Susman, however, argues that her claim is not barred by any statute of limitations because until 1991, she did not know Schmid had manufactured her IUD and until she spoke with Shainwald in 1992, she did not know Schmid had committed any wrongdoing. Susman argues:

> [She] did not *realize* until 1991 when she finally obtained her medical records, that

she had not worn a Dalkon Shield, but rather a Saf–T–Coil IUD. It was not until she contacted ... Shainwald to inquire about the Saf–T–Coil, that she discovered that there was wrongdoing with respect to [Schmid's] failures to test the Saf–T–Coil and warn physicians and their patients of the dangers of pelvic infection, loss of organs and possibly, death.

Susman Opp. at 15 (emphasis added).

Susman's arguments have no merit. As early as 1978, Susman was aware that her IUD might have caused her injuries. Faced with permanent injury and the statement by her doctor that her IUD may have been the cause, " '[w]rongdoing' by someone was more than a hypothetical possibility" and the wrongdoing element was met. *Nelson,* 815 F.Supp. at 504.

Even if Susman did not realize in 1978 that she was the victim of wrongdoing, in 1986 when she learned of and participated in the Dalkon Shield litigation, under the District of Columbia discovery rule, Susman's cause of action accrued and the statute of limitations began to run. Susman states that in 1986, she read about the "adverse effects" suffered by Dalkon Shield users. Susman Aff., ¶ 17. She read that these injuries were compensable and that lawsuits were being filed against the manufacturer. *Id.* Susman, already aware that her IUD might have caused her injuries, filed a claim against Robins. At this point, not only was Susman aware of the possibility of wrongdoing, she took affirmative action to obtain legal redress.

Susman's error was suing the wrong manufacturer after she read of wrongdoing through the Dalkon Shield publicity in 1986. However, this error was not caused in any way by Schmid. As stated in *Dawson,* the action accrued "when the plaintiff discovered, or by due diligence should have discovered, the wrongdoing." 543 F.Supp. at 1338.

Despite the unambiguous notation by Dr. Hardy in her medical records, Susman did not exercise the due diligence mandated by the discovery rule. She did not review her medical records when she first became aware of wrongdoing by IUD manufacturers or before pursuing her claim against Robins. Ac-

cordingly, the three-year statute of limitations in the District of Columbia commenced, at the latest, in 1986 when Susman learned of the Dalkon Shield litigation and the wrongdoing associated with the manufacturer of IUDs.

### 2. *New Jersey*

■ New Jersey has a two year statute of limitations for personal injury actions. N.J.S.A. § 2A:14–2.[10] To avoid harsh results that might flow from a mechanical application of the statute of limitations, New Jersey has also adopted a discovery rule. *Apgar v. Lederle Laboratories, Div. of American Cyanamid Co.,* 123 N.J. 450, 455, 588 A.2d 380 (1991) (citing *Vispisiano v. Ashland Chem. Co.,* 107 N.J. 416, 527 A.2d 66 (1987)); *see also Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 580 (3d Cir.1990); *Wade v. Armstrong World Industries, Inc.,* 746 F.Supp. 493, 499 (D.N.J.1990); *Lopez v. Swyer,* 62 N.J. 267, 272, 300 A.2d 563 (1973). Under the discovery rule,

> a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.

*Abboud v. Viscomi,* 111 N.J. 56, 61, 543 A.2d 29 (1988) (quoting *Lopez,* 62 N.J. at 272, 300 A.2d 563). Stated differently,

> [t]he statute of limitations begins to run once an individual had knowledge or should have knowledge that he has sustained an injury which is or may be attributable to the fault of another.

*Wade,* 746 F.Supp. at 499 (citing *Lynch,* 85 N.J. at 70, 424 A.2d 1169); *see also Burd v. New Jersey Telephone Co.,* 76 N.J. 284, 292, 386 A.2d 1310 (1978) ("cause of action accrues when 'the injured party discovers ... that he [or she] *may* have a *basis* for an actionable claim'" (first emphasis added, second emphasis in original)). To trigger the statute of limitations under the discovery rule, a plaintiff need not be told the defendant committed a tortious act or have had legal advice. *Savage v. Old Bridge–Sayre-*

*ville Med. Group, P.A.,* 260 N.J.Super. 417, 423, 616 A.2d 1307 (App.Div.1992) (citing *Burd,* 76 N.J. at 291, 386 A.2d 1310). Moreover, the plaintiff need not know the actual identity of those responsible for the injury; a "John Doe" complaint may be filed. *Id.* (citing *Apgar,* 123 N.J. at 456, 588 A.2d 380; *Viviano v. CBS, Inc.,* 101 N.J. 538, 554, 503 A.2d 296 (1986)); *see Jordan v. Emergency Physicians Associates, P.A.,* No. 92–2421, 1992 WL 233866 *3 (D.N.J. 9 Sept.1992) ("[D]iscovery rule is intended to toll the limitations period where plaintiff lacks knowledge of a cause of action, not the identity of potential defendants."). *But see Allied Corp. v. Frola,* 730 F.Supp. 626, 631 (D.N.J.1990) (in context of environmental toxic tort, statute of limitations will not begin to run until defendant is identifiable because of large numbers of potentially responsible parties).

The Supreme Court of New Jersey has observed that the

> purpose of statutes of limitations is to stimulate litigants to pursue their causes of action diligently and to "spare the courts from litigation of stale claims." When an injured person sleeps on his [or her] rights so long as to let the customary period of limitations expire, "the pertinent considerations of individual justice as well as the broader considerations of repose[ ] coincide to bar his action."

*Vispisiano,* 107 N.J. at 426, 527 A.2d 66 (quoting *Farrell v. Votator Div. of Chemetron Corp.,* 62 N.J. 111, 115, 299 A.2d 394 (1973)).

■ Just as Susman's claim was barred by the three year statute of limitations for the District of Columbia, Susman's claim is similarly barred by the two year statute of limitations for New Jersey. Susman was injured in 1978 and was informed by Dr. Hardy her IUD might have been the cause. Susman then became aware in 1986 of wrongdoing associated with the manufacturer of the Dal-

---

**10.** Section 2A:14–2 provides:

Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this state shall be

commenced within 2 years next after the cause of any such action shall have accrued.

N.J.S.A. 2A:14–2.

kon Shield by Robins.[11] Susman equated her injuries with those complained of by other Dalkon Shield users. The name of the IUD she used was clearly set forth by Dr. Hardy in the 1978 notation in Susman's medical records. During the course of 1986, Susman knew or should have known that her injuries were attributable to the fault of another. Having been alerted to the Dalkon Shield litigation, Susman's failure to review her own medical records or make inquiry of her doctors as to the brand of IUD she used will not prevent the statute of limitations from running. Accordingly, the two-year statute of limitations in New Jersey commenced, at the latest, in 1986 when Susman learned of the Dalkon Shield litigation and the wrongdoing associated with the manufacture of IUD's.

### 3. *New York*

New York provides for a three-year statute of limitations in personal injury actions. N.Y.C.P.L.R. § 214(5). New York, however, has declined to adopt a discovery rule except when provided for by statute. *Snyder v. Town Insulation,* 81 N.Y.2d 429, 599 N.Y.S.2d 515, 615 N.E.2d 999 (1993) (citing *Thornton v. Roosevelt Hosp.,* 47 N.Y.2d 780, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979)); *see Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) (statute revived for one year action for DES related injuries that were barred by statute of limitations).

In considering other personal injury cases involving IUD's, the New York State courts have held the cause of action accrues on "the date of onset of injury, rather than the date of insertion" of the IUD. *Allen v. Handszer,*

148 Misc.2d 334, 560 N.Y.S.2d 593, 598 (Sup. Ct.1990); *Lindsey v. A.H. Robins Co.,* 91 A.D.2d 150, 157, 458 N.Y.S.2d 602 (2d Dept.), *aff'd,* 60 N.Y.2d 417, 469 N.Y.S.2d 923, 457 N.E.2d 1150 (1983); *Reyes v. Bertocchi,* 92 A.D.2d 863, 866, 459 N.Y.S.2d 834 (2d Dept. 1983). Accordingly, the three-year statute of limitations in New York began to run against Susman in 1978, when she sustained her injuries, and in no event later than 1986.

### 4. *Connecticut*

Connecticut provides for a three-year statute of limitations in product liability actions which begins to run when the injury occurs or when the plaintiff should have discovered the injury through the exercise of reasonable care. C.G.S.A. § 52–577a.[12] Under Connecticut law, " 'the statute of [limitations] begins to run when the plaintiff discovers *some form of* actionable harm, not the fullest manifestation thereof.' " *Gnazzo v. G.D. Searle & Co.,* 973 F.2d 136, 138 (2d Cir.1992) (emphasis in original) (quoting *Lambert v. Stovell,* 205 Conn. 1, 529 A.2d 710, 713 (1987)).

In *Gnazzo,* a case factually similar to the present action, a woman brought suit against the manufacturer of her IUD for personal injuries. 973 F.2d at 137. Plaintiff had an IUD inserted in 1974. Within one year plaintiff was diagnosed with PID and was informed the IUD might have been the cause. The IUD was removed in 1977. In 1981, plaintiff began hearing and reading about how damaging IUD's could be and in 1989, she was informed she was infertile because of PID-induced adhesions. Summary judgment was granted in favor of the IUD manufacturer because the three year statute of limitations had elapsed. Begin-

---

11. The present case is distinguishable from *Savage,* a case heavily relied upon by Susman. In *Savage,* the plaintiff had been aware since she was a young child that the discoloration of her teeth was the result of ingesting tetracycline while still a small child. 260 N.J.Super. at 419, 616 A.2d 1307. The court held the twenty-eight year old plaintiff was not barred by the statute of limitations because, under the discovery rule, she may have been unaware that her injury was attributable to fault or wrongdoing. *Id.* at 422, 616 A.2d 1307. Unlike in *Savage,* however, Susman believed her injuries were attributable to fault by Robins. Susman's suspicions were more

than aroused; by 1986, she had joined the litigation against Robins. Her error in suing Robins is the result of her own inattention or carelessness or both.

12. Section 52–577a(a) provides, in relevant part:

No product liability claim as defined in section 52–272m shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered....
C.G.S.A. § 52–577a(a).

ning in 1981, plaintiff recognized, or should have recognized, the critical link between her injury and the defendant's causal connection to it. In other words she had " 'discover[ed] or should have discover[ed] through the exercise of reasonable care, that ... she ha[d] been injured and that [defendant's] conduct caused such injury.' " *Id.* at 138 (quoting *Champagne v. Raybestos–Manhattan,* 212 Conn. 509, 562 A.2d 1100, 1107 (1989)). By 1990, when plaintiff filed her complaint, the statute of limitations had elapsed.

Similarly, in the present case, Susman knew, since 1978, that she had been injured and that her IUD might have caused the injuries. Since 1978, the medical records kept by Dr. Hardy indicated the brand of IUD she had used. Further, in 1986, she became aware of the injuries caused by another IUD, the Dalkon Shield. She filed a claim against Robins for her own injuries. At this point, Susman, through the exercise of reasonable care, should have discovered the "critical link" between her injuries and Schmid. Accordingly, the statute of limitations in Connecticut governing Susman's claims began to run in 1986 and elapsed in approximately 1989.

### 5. *California*

 California provides for a one-year statute of limitations in personal injury actions. Cal.Code.Civ.Proc. § 340(3). Under the discovery rule applied in California,

> "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.... A plaintiff need not be aware of the specific 'facts' necessary to *establish* the claims [such as failure to test, failure to warn, failure to diagnose]; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; *she cannot wait for the facts to find her."*

*Rose v. Fife,* 207 Cal.App.3d 760, 769, 255 Cal.Rptr. 440 (2d Dist.1989) (emphasis in original) (quoting *Jolly v. Eli Lilly & Co.,* 44

Cal.3d 1103, 1110–1111, 245 Cal.Rptr. 658, 751 P.2d 923 (1988)). When a woman who has been injured by an IUD becomes aware of a link between one type of IUD and certain injuries, the statute of limitations is not suspended until she also learns that her specific brand of IUD is linked to these injuries as well. "[T]he one year statute of limitations will begin to run when the plaintiff *suspects or should suspect* that her injury was caused by wrongdoing." *Id.* 207 Cal. App.3d at 771, 255 Cal.Rptr. at 447.

In the present case, not only was Susman aware of her injury and advised that her IUD was a possible cause in 1978, she became aware of and participated in the litigation against the manufacturers of the Dalkon Shield in 1986. Susman suspected wrongdoing and filed a claim in relation to the Dalkon Shield litigation. Once on notice, however, Susman did not review her medical records or consult with her doctors as reasonable diligence would compel. *See Rose,* 255 Cal. Rptr. at 447 ("[O]ne year period begins to run when [plaintiff] has information that would make a reasonable person inquire ... and she has the opportunity to obtain knowledge through investigation of sources open to her."). Accordingly, the one-year statute of limitations in California began to run in 1986, when her suspicions were aroused about wrongdoing by Robins, and elapsed in 1987.

### *Conclusion*

 Since 1978, Susman has been aware her personal injuries might be related to her use of an IUD. Around the time her IUD was removed and during the course of her extensive surgery, Dr. Hardy informed her the IUD might have been the cause. In 1986, Susman became aware, through the media, of the dangers associated with another IUD, the Dalkon Shield. Susman entered the Dalkon Shield litigation and filed a claim seeking compensation for her injuries. At all times since 1978, the name of the IUD used by Susman was recorded in her medical records. Susman did not chose to review her own medical records until 1991. Under all

the statutes of limitations discussed above, Susman's claim is time-barred.[13]

For the reasons set forth above, the motion for summary judgment by Schmid is granted.

---

**13.** It appears some states, such as New York provide for different statutes of limitations for ferent times. For example New York has enact-breach of warranty. As stated in *Reyes:* "A cause of action for breach of warranty, either express or implied, normally accrues at the time of sale, and pursuant to the Uniform Commercial Code would have to be brought within four years therefrom." 92 A.D.2d at 867. Accordingly, the statute of limitations governing Susman's claims for breach of warranty began to run around 1970, the time of insertion and elapsed in approximately 1974. However, because these alternate theories have not been argued by Susman, Susman appears to concede they will not prevent a grant of summary judgment against her.